760 A.2d 272

**Soren HARBOM**

v.

**Judith HARBOM.**

**No. 1711, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Oct. 3, 2000.

432

**434**

436

Joel Marc Abramson, Columbia, for appellant.

Lillie Price–Wesley, Columbia (Shirley S. Massey, Ellicott City, on the brief for minor Children), for appellee.

Argued before MOYLAN, DAVIS and SALMON, JJ.

DAVIS, Judge.

Appellant Soren Harbom was granted a Judgment of Absolute Divorce from appellee Judith Harbom in the Circuit Court for Howard County on June 8, 1999. Appellant filed an action for divorce on grounds of adultery in May 1996, and appellee filed a counterclaim for divorce on grounds of constructive desertion in the same month. A consent order was entered on May 12, 1997, under which appellant agreed to pay appellee *pendente lite* alimony of $2,500 per month and *pendente lite* child support of $1,500 per month. After the appointment of counsel to represent the parties' two minor children, the parties entered into a Stipulation and Agreement Regarding Custody, under which they were awarded joint legal custody of both children and appellee was granted primary physical custody. This agreement was incorporated into a Consent Order entered on June 25, 1997. After a hearing on appellant's Exceptions to the Master's Written Report and Recommendations, the court awarded appellee $1,600 in retroactive alimony and $800 in retroactive child support in an order entered on June 10, 1998.

The case proceeded to trial on the merits on September 8, 1998, on appellant's complaint and appellee's amended counterclaim. After the trial court filed its Judgment of Absolute Divorce and appellant filed a Motion to Alter or Amend Judgment on June 11, 1999, the court denied the motion on August 16, 1999, and this appeal ensued. Appellant raises six

questions for our review and appellee filed a cross-appeal, raising eight questions. Because some of these questions address the same issues, we list them together, rephrased, and renumbered as follows:

I. Did the trial court err in determining that the prenuptial agreement was valid and enforceable?

II. Did the trial court err in classifying certain property as marital or nonmarital?

III. Did the trial court err in ordering appellant to transfer title of a van to appellee?

IV. Did the trial court err in granting appellee indefinite alimony?

V. Did the trial court err in calculating child support?

VI. Did the trial court err in making a combined child support and alimony award that constitutes 70.5% of appellant's net income?

VII. Did the trial court err in refusing to consider whether to grant appellant a dependency deduction?

VIII. Did the trial court err in awarding appellee counsel fees?

We answer questions one through six and question eight in the negative and question seven in the affirmative, thereby affirming in part and reversing in part the judgment of the trial court.

## FACTUAL BACKGROUND

The parties were married on June 21, 1986, in Montgomery County, Maryland. Prior to the marriage, on March 31, 1986, the parties entered into an antenuptial agreement under which each party waived "any right or claim ... in the property of [the other party, including] all future growth, interest, ... or changes in assets, traceable to [the other party's] current ownership of the property." Appellant also agreed to transfer title to a home known as the Billow Row property to himself and appellee as tenants by the entireties, following the marriage. Appended to the document was a listing of appellant's

substantial premarital assets, without valuations; whether this appendix was actually shown to appellee is disputed. At the time of the marriage, appellant's assets included a significant stake in A/S Plastmontage, a Danish plastics company founded by appellant's father; a stake in Plastmo Ltd., a Canadian subsidiary of Plastmontage; several loans to Plastmo Ltd. and Plastmo Inc., an American subsidiary of Plastmontage; several investment and deposit accounts; a property in Springfield, Oregon; and the Billow Row property. Most of these assets were traceable to a gift of shares in Plastmontage in 1962 from appellant's parents to appellant. The gift was subject to the condition that, "[i]n case our son might get married, both the stocks and the dividends from them, or anything that might replace these, will belong to him as (his) separate property." Appellee had no substantial assets at the time of the marriage.

After the parties married, they resided at the Billow Row home, which was transferred to the parties as tenants by the entireties on March 24, 1988. Two children were born to the marriage—Kirsten Harbom, on October 13, 1987 and Lise Harbom, on September 24, 1990. In March 1989, the parties purchased as tenants by the entireties a new home on Crows Nest, which was purchased in cash, using nonmarital funds of appellant. The Billow Row home was retained as a rental property.

The parties' marital difficulties began in 1990. There were arguments over the prenuptial agreement, appellee's lack of financial interest in appellant's assets, appellee's relationship with appellant's family, and appellant's lack of interest in sexual relations. Appellant alleges that appellee engaged in erratic and sometimes violent behavior; appellee alleges that appellant was verbally abusive and emotionally detached. Appellant refused to attend counseling sessions on the grounds that appellee's therapist had told her that "no marriage could be whole with a Prenuptial Agreement." Appellee began an affair in July 1994, that continued until July 1995, when she informed appellant of the affair and of her desire to separate. The parties agreed to stay together and work on the marriage,

but the problems continued and appellee met a man in December 1995, with whom she later had another affair. Appellant filed for divorce on May 7, 1996.

The parties resided at the Crows Nest home until their separation on October 1, 1996. In December 1996, the parties executed a deed transferring the Billow Row and Crows Nest properties to appellant as sole owner, in exchange for a payment of $260,000 from appellant to appellee. Appellee used a substantial portion of this payment to purchase a home on Clarkson Drive, which she owns with her father and where she and the children reside.

Appellant is forty-one years of age, holds a high school degree, and has worked for Plastmontage and Plastmo, Inc., during his adult life. Appellee is forty-one years of age and holds an undergraduate teaching degree, with a current certification in special education. At the time of the marriage, she was working as a special education teacher for Calvert County Public Schools.

Additional facts will be provided as they become relevant to our discussion of the issues raised in this appeal.

## DISCUSSION

### I

Alleging that "[appellant] admitted that neither the assets *or* their values were disclosed," appellee contends that "case law holds this failure invalidates the agreement." We begin with the proposition that, under general contract principles, parties should be free to enter into contracts and such agreements entered into freely, voluntarily, and with knowledge of all relevant facts should not be set aside simply because one of the parties subsequently decides that he or she made a bad deal. *College of Notre Dame v. Morabito Consultants, Inc., et al.*, 132 Md.App. 158, 173–74, 752 A.2d 265 (2000); *Missouri, Kan. & Tex. Ry. Co. v. Harriman Bros.*, 227 U.S. 657, 33 S.Ct. 397, 57 L.Ed. 690 (1913). Absent fraud, mistake or duress, courts are averse to interfere with the right

to freely contract unless an agreement is unconscionable in its affect or the manner of procurement or one party is manifestly in a superior bargaining position, i.e., a confidential relationship. Even so, that inequality may be cured by the access to legal counsel by the party in the less advantageous bargaining position. As to antenuptial agreements, forty-five years ago, Maryland followed the general rule that "an antenuptial contract which provides for, facilitates or intends to induce a separation or divorce of the parties after marriage is contrary to public policy, and is therefore void." *Cohn v. Cohn,* 209 Md. 470, 475, 121 A.2d 704 (1956). The rationale was based on the Court's distinction between agreements that have a natural tendency to induce separations, and those that represent a fair and reasonable compromise, after a separation had occurred or when one is in immediate contemplation. *Id.* at 476, 121 A.2d 704. The Court of Appeals, however, in *Frey v. Frey,* 298 Md. 552, 471 A.2d 705 (1984), repudiated the prohibition of antenuptial agreements based on public policy, observing that "the common law is . . . subject to modification by judicial decision in light of changing conditions or increased knowledge where this Court finds that it is a vestigue of the past, no longer suitable to the circumstances of our people." *Id.* at 562, 471 A.2d 705 (citing *Felder v. Butler,* 292 Md. 174, 438 A.2d 494 (1981)). The Court held that "the policy reasons supporting *Cohn* [are] no longer suitable today."

As a result of that holding, the Court concluded that there was no longer to be a distinction drawn upon whether an antenuptial agreement is in contemplation of death of one of the spouses or the dissolution of the marriage. The Court then went on to pronounce that the validity of such agreements must be evaluated upon the factors indicated in *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (1967).

In *Hartz,* the Court characterized the nature of the relationship between the parties and the requirement for there to be valid agreement:

>*Levy [v. Sherman,* 185 Md. 63, 43 A.2d 25 (1945) ] and *Ortel [v. Gettig,* 207 Md. 594, 116 A.2d 145 (1955) ] establish the law of Maryland to be that there is a confidential

relationship between a man and a woman who are about to enter into an antenuptial agreement whether or not they are then engaged and whether or not the marriage is to be one of convenience; that this confidential relationship calls for frank, full and truthful disclosure of the worth of the property, real and personal, as to which there is a waiver of rights in whole or in part, so that he or she who waives can know what it is he or she is waiving. If there is adequate knowledge of what that frank, full and truthful disclosure would reveal, this may serve as a substitute though there has been no such disclosure. If there is neither proper disclosure nor actual knowledge and the allowance made to the one who waives is unfairly disproportionate to the worth of the property involved at the time the agreement is made, *the burden is cast upon the one who relies on the agreement* to prove that it was entered into voluntarily, freely and with full knowledge of its meaning and effect. The reviewing court is much more apt to find there was voluntary and understanding execution if the one who later asserts invalidity had independent legal advice as to the execution. . . .

The real test in a determination of the validity of an antenuptial agreement is whether there was overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement. Frank, full and truthful disclosure of what is being relinquished (or in lieu thereof actual knowledge otherwise available or obtained) is the key that turns the lock of the door leading to impregnable validity.

(Emphasis added; footnotes omitted.)

Citing Lindey, *Separation Agreements and Antenuptial Contracts*, § 90–44, the Court addressed the test in determining the validity of antenuptial agreements:

If there is not adequate disclosure or knowledge (we will assume that the chancellor was not in error in deciding there was not), the validity of the agreement must be tested by other standards—that is, was the benefit to the wife commensurate with that which she relinquished so that the

agreement was fair and equitable under the circumstances—and did the subsequent would-be repudiator of the contract enter into the agreement freely and understandingly. Lindey, *Separation Agreements and Ante-nuptial [sic] Contracts,* § 90–44, points out that failure to disclose or lack of precise knowledge will not necessarily be fatal to the validity of an antenuptial agreement, saying: "The test of the *adequacy* of the provision will still remain, and if it is met, the agreement may be enforced. For the basic issue is overreaching, not the absence of disclosure. If the intended wife is not prejudiced by the lack of information, she may not repudiate."

In determining whether or not the one who waives was prejudiced or unfairly or unreasonably treated, either in result or in being induced to enter into the contract to waive, the courts have weighed and assessed various pertinent and relevant factors, including the situation of the parties, their ages, their respective holdings and income, their respective family obligations or ties, the circumstances leading to the execution of the agreement, the actions of husband and wife after the marriage as they tended to show whether the agreement was voluntarily and understandingly made, the needs of him or her who made relinquishment, including whether or not that one, after the death of the other, can live substantially as comfortably as before the marriage.

(Citations omitted.)

With respect to the requirement for disclosure, citing Lindey, § 90–44, *Hartz* observes, "While the disclosure should be full, fair and open, it has been said it need not be a drastically sweeping one, and the wife need not know the husband's [1]

---

1. Judicial decisions and treatises in 1967 (the year that *Hartz* was decided), for the most part, employed the masculine pronouns, "he," "him" or "his" and referred to "the husband" generally as the party who possessed the greater fortune, income, and financial resources and thus presumably the party seeking to uphold the validity of an antenuptial agreement. Because of the dramatic increase in the percentage of prospective wives of independent means and substantial separate and

exact means, so long as she has a general idea of his property and resources." *Hartz*, 248 Md. at 57, n. 4, 234 A.2d 865.

From the above, we glean certain general principles. First, if the parties wish to insulate the agreement from subsequent challenge on the basis of overreaching, full, frank, and truthful disclosure serves to make the validity of the agreement "impregnable." The alternative to full disclosure is proof that the disgruntled party had a "general idea" of the spouse's property and resources. When there is neither full disclosure or actual knowledge and the allowance to the party who waives is unfairly disproportionate to the worth of the property involved, the party seeking to uphold the agreement simply must shoulder the burden to prove that it was entered into voluntarily, freely, and with full knowledge of its meaning and effect.

Concerning the validity of the antenuptial agreement, the trial court stated:

[Appellee] claimed that there was no disclosure of assets or that the value of the items in the prenuptual [sic] agreement was not disclosed to her. Although the agreement does not disclose the value of the assets, the case law indicates this fact alone is not dispositive. Here it appears the [appellee] had her father, who is a lawyer and had knowledge of financial matters, negotiate the arrangement, or the agreement, on her behalf, and an independent lawyer drafted the agreement. It also appears to the [c]ourt from testimony that [appellee] had reasonably good understanding of what she was giving up. She may not have known the dollar amount, but that does not change the fact that she knew that Plastmo was worth a lot of money, and she gave it up. Did she make a wise agreement from her point of view? No. But it's a binding one.

---

sole estates, it is just as likely that the sponsor of an antenuptial agreement is the wife as the husband. Accordingly, all references in the discussion herein regarding general principles as well as language in the decisions cited regarding general principles is equally applicable to husbands and wives.

During the course of appellant's direct examination, the following transpired:

Q. Okay. Did there come a time when the agreement had been prepared?

A. Yes, there did.

Q. Okay. And what did you do?

A. I—I looked at the agreement and it was sent up to my father for his—for him to read.

Q. And then how did you know that it was okay with [appellee]?

A. Because I knew my father had forwarded it to [appellee's] father and I know from [appellee] that he encouraged her to sign it.

The following exchange occurred when appellant's father testified:

A. Yeah, we had a very nice dinner, and when dinner was finished [appellee's father] said to me, let us go in here in the other room and speak about economics.

Q. And the economics meant in your mind?

A. That meant the Prenuptial Agreement.

Q. Prenuptial, okay. So when you met with him what occurred?

A. The first thing that happened was that he asked me to tell a little about the family history. So—said where all this money came from, and I told him that (indiscernible) had been in wholesaling and had a wholesaling business, but that we in 1958 started a plastic business called Plastmontage. That was the beginning of Plastmo. And then I also told him that we have shares, how many shares (indiscernible) the same amount of all of them, and that was 1962, but we have taken and made it a condition that when they married they should have a Prenuptial Agreement, and that had been made for the two sons already. That was in Danish, of course. But I translated to [appellee's father] what it said.

Paragraph 3 of the prenuptial agreement reads, in pertinent part: "This waiver shall attach to all future growth, interest, dividends, profits, additions, accumulated income, or changes in assets, traceable to, arising out of, or in any way or manner derived from HARBOM's *current ownership of the property listed on Exhibit A.*" (Emphasis added.) Exhibit A, the schedule of property without valuation referenced in the agreement, includes:

1) All shares of A/S Plastmontage

2) All shares of Plastmo Limited

3) All existing accounts, certificates of deposits, etc. in [appellant's] name in Maryland National Bank and Privatbanken (Denmark)

4) All individual loans by [appellant] to Plastmo Limited and Plastmo, Inc.

5) All stocks, cash accounts or bonds in Alex Brown's and Paine Weber's house accounts in the name of [appellant]

6) The property on Shelley Street in Springfield, Oregon.

In a correspondence, dated January 3, 1986, from appellant's father to appellee's father, the former expressed the expectation that appellee's father would explain the terms of the agreement to his daughter and that any objections to the agreement should be communicated to appellant's father:

Dear Bob,

This prenuptural [sic] agreement has been prepared by attorney at law [M]r. E. Alexander Adams, Elicott [sic] City, Maryland.

I know, it is important for [appellee], that she will have a joint ownership of their common home, and this agreement will take care of that and should be according to the Maryland law.

I hope that you can agree and that you will speak with [appellee] about the agreement, so that she will understand, that it will have no effect in their daily life.

I appreciate very much your cooperation in this matter, and if you have any objections, please feel free to contact me.

Ays and I want you to know, that we are very happy with [appellee], and that we feel, that [appellee] and [appellant] will have all possibilities to get a happy and good life together.

We send you our regards and best wishes for the new year to yourself and your whole family.

Sincerely yours,

Despite her acknowledgement that she accompanied appellant to the office of the lawyer who prepared the agreement, appellee testified that she did not remember seeing the schedule of appellant's assets and she further claimed to have had no memory of any meeting between her father and appellant's father or that the agreement was ever explained to her before she signed it.

From the foregoing, the trial court had before it testimony, as well as correspondence from appellant's father to appellee's father, that the antenuptial agreement had been forwarded to appellee's father who had encouraged appellee to sign it. The antenuptial agreement, executed by appellee, referenced the schedule of appellant's assets, which at the very least served to put appellee and her father on notice of the schedule if it was not appended to the agreement.

Moreover, the testimony of appellant's father was that, during a conversation regarding the antenuptial agreement, appellee's father had said "where [sic] all this money came [sic] from, and I told him that (indiscernible) had been in wholesaling and had a wholesaling business.…" Appellant's father also told appellee's father that, for business reasons, he had insisted on prenuptial agreements when two of his other sons had married. From the testimony regarding the substance of the conversation between the fathers of appellant and appellee in their meeting after dinner and the correspondence concerning the antenuptial agreement sent to appellee's father, the trial judge could certainly infer that appellee's

father had relayed the information received during his conversation to his daughter and had discussed whether she should agree to the terms contained therein.

Significantly, appellant's father underscored the fact that there were business reasons for his insistence that his sons have antenuptial agreements executed before they married and a further inference is that appellee's father, a Harvard-trained tax attorney, understood that, given the nature of the property as nonmarital, appellee would have no legal claim to the value of appellant's assets at the time of the marriage even without the antenuptial agreement. As an attorney negotiating in his daughter's best interest, therefore, he sought to have their residence at Billow Row conveyed from appellant to appellant and appellee as tenants by the entireties.

As noted earlier, appellant is forty-one years of age and a high school graduate who has worked for Plastmontage and Plastmo, Inc. for his entire adult life. Appellee, also forty-one years of age, is a college graduate with a current certification in special education. Although appellant's assets and income are substantially greater than appellee's, his holdings are, for the most part, derived from the family business. Regarding the actions of husband and wife after the marriage as tending to show whether the agreement was voluntarily and understandingly made, all of appellee's protestations that she was unaware of appellant's assets and that she did not knowingly and intelligently execute the antenuptial agreement, are contradicted by the circumstances leading to the execution of the agreement. Those circumstances include the fact that appellee acknowledged going to the law office of E. Alexander Adams to execute the agreement, the extensive discussions between her father and appellant's father about the nature and extent of the family business of appellant, the correspondence in which appellant's father advised appellee's father to "feel free to contact me" if he had any objections, the fact that, as a result of the negotiations of appellee's father, appellant's residence was deeded to husband and wife, jointly, and, notably, appellee's father was a Harvard-trained tax attorney who

actively participated in the negotiations and execution of the antenuptial agreement.

■ The trial court, in observing that the agreement "[did] not disclose the value of the assets," stated that the case law indicates that this fact alone is not dispositive. The court noted that appellee's father is a lawyer, that he negotiated the agreement on his daughter's behalf and that appellee "had reasonably good understanding of what she was giving up." Although the court did not cite to *Hartz* or the particular "case law" to which she referred, it is well settled that trial judges are presumed to know the law and apply the law correctly to the case before them. *Strauss v. Strauss,* 101 Md.App. 490, 511, 647 A.2d 818 (1994). The lower court, in noting the aforementioned circumstances leading to the execution of the agreement, set forth the substance of the rationale underpinning her conclusion that, notwithstanding that there was no valuation of the assets on the schedule of appellant's property, "she knew that Plastmo was worth a lot of money, and she gave it up."

We are satisfied that this finding, under the circumstances of the case *sub judice,* is consistent with the principle espoused in Lindey, *Separation Agreements and Antenuptial Contract,* § 90–44, that the disclosure need not be a drastically sweeping one and the wife need not know the husband's exact means so long as she has a general idea of his property and resources. The discussions between appellant's father and appellee's father regarding the nature and extent of the Harbom family holdings and the logical conclusion that appellee's father shared that information with her in the course of negotiating the agreement amply support the court's finding that appellee knew that she was relinquishing any claim to substantial holdings. While the value of the items was not disclosed, the court found that appellee had actual knowledge of every fact regarding appellant's assets and income that she was interested in or sought to discover.

■ As we noted earlier, however, even if the court had found that there was neither full disclosure or actual knowl-

edge, the agreement is not necessarily rendered invalid. As *Hartz* points out, the burden is simply "cast upon the one who relies on the agreement to prove that it was entered into voluntarily, freely and with full knowledge of its meaning and effect." Indeed, the court's finding discussed the most cogent factors which would indicate that appellee entered into the agreement voluntarily, freely and with full knowledge of its meaning and effect and that there was no overreaching. We find nothing in *Hartz* or decisions cited therein which require that the trial judge utter the words "appellant has sustained his burden" in order for the findings of fact to support adequately the conclusion that the agreement was voluntary.

As the Court noted in *Hartz*, "The real test in a determination of the validity of an antenuptial agreement is whether there was overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement." *Hartz*, 248 Md. at 57, 234 A.2d 865. More to the point, as *Hartz* explains, "For the basic issue is overreaching, *not the absence of disclosure*. If the intended wife is not prejudiced by the lack of information, she may not repudiate." [2] Not only was there no evidence of overreaching in the case *sub judice*, appellee, with benefit of legal counsel, was given every opportunity to object or make a new proposal if the terms of the agreement were not acceptable to her. Consequently, the antenuptial agreement was valid and enforceable.

## II

Appellant contends that the trial court erred in classifying certain property as marital or nonmarital. He argues that the Individual Retirement Account (IRA) in appellee's name and

---

2. Indeed, under certain circumstances, an intended spouse may assent, as part of the antenuptial agreement, to forego disclosure of the other spouse's assets, so long as the assenting party entered into the agreement voluntarily, freely, and with full knowledge of its meaning and effect.

her current residence on Clarkson Drive should have been found to be marital property. Appellee disputes this contention and, for her part, argues that the Billow Row and Crows Nest properties should have been found to be marital property.

Maryland Code (1999 Repl.Vol.), Fam. Law (F.L.) § 8–201(e), defines marital property as follows:

(1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.

(2) "Marital property" includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.

(3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:

 (i) acquired before the marriage;

 (ii) acquired by inheritance or gift from a third party;

 (iii) excluded by valid agreement; or

 (iv) directly traceable to any of these sources.

With this definition in mind, we shall consider each disputed item in turn.

### Appellee's IRA

Appellant contends that the trial court erred in classifying the IRA in appellee's name as nonmarital, arguing that the IRA was a gift from appellant to appellee. Appellee counters that appellant deposited the money into the account with the "intention to give up any future claim" in the funds, noting that appellant normally took care that all property was titled solely to himself.

Appellant states that "[i]t is elementary that a gift between spouses is marital property," citing our decision in *Choate v. Choate*, 97 Md.App. 347, 629 A.2d 1304 (1993). Unfortunately, the law on gifts between spouses is anything but elementary. In Maryland, questions of legal estates in property are separate from the classification of property as "marital" or "nonmarital" under the Property Disposition in

Divorce Act (the Act).[3] *See Watson v. Watson,* 77 Md.App. 622, 633, 551 A.2d 505 (1989). With regard to gifts, then, "even if a party proves a gift of the title, it does not transmute the property from nonmarital to marital." *Choate,* 97 Md. App. at 360, 629 A.2d 1304 (citing *Watson,* 77 Md.App. at 636, 551 A.2d 505).

While gift of the title may be presumed under some circumstances "to establish a gift of the status of the property under the Act in addition to the legal estate, thereby effecting a transmutation of the property from nonmarital to marital or vice versa . . ., proof of all of the elements of such a gift is required." *Watson,* 77 Md.App. at 633, 551 A.2d 505. These elements are: "donative intent, delivery or relinquishment of dominion, and acceptance (which is presumed in the absence of evidence to the contrary)," *id.,* each of which must be proved by the donee by clear and convincing evidence. *Dorsey v. Dorsey,* 302 Md. 312, 318, 487 A.2d 1181 (1985). The donative intent required is the "intention to give or relinquish the contingent equitable claim that arises from the marital/nonmarital status of the property. . . ." *Watson,* 77 Md.App. at 633, 551 A.2d 505.

In the case *sub judice,* the court reasoned that the IRA was nonmarital because "[f]rom the testimony . . . I think it was a gift" from appellant to appellee. We interpret the court's statement as a finding that appellant made a gift of his legal and equitable interest in the IRA funds; thus, the court did not err in this determination. Appellant was meticulous in his financial record-keeping and he took care that all of his significant investment and real estate holdings—even the family cars—were titled solely in his name. The properties that were not so titled were: the Billow Row property, which was titled as tenants by the entireties, pursuant to the antenuptial agreement; the Crows Nest property, which appellant had titled as tenants by the entireties to make appellee comforta-

---

**3.** 1978 Md. Laws ch. 794 (codified as amended at F.L. §§ 8–201 to 8–213).

ble in the marriage and to get her excited about the house; and the IRA, which appellant created primarily with his nonmarital funds, also to make appellee comfortable in the marriage.

Appellant testified that "the Prenuptial Agreement was a big concern for [appellee]. She constantly talked about it.... [S]he wanted to own everything that I owned. She wanted the Prenuptial Agreement torn up." It is reasonable to believe from this testimony that appellant created the IRA to alleviate appellee's concern that she had nothing in the marriage. When contrasted with appellant's usual practice of titling everything solely in his name to ensure his equitable interest therein, his creation of the IRA in appellee's name may be interpreted as evidencing an intent to relinquish his equitable interest in those funds. The trial court did not err in classifying the IRA as nonmarital.

### *Billow Row, Crows Nest, and Clarkson Drive Properties*

 Appellant argues that the Clarkson Drive residence should have been classified as nonmarital because it was purchased by appellee during the marriage and the trial court did not find that it was excluded by "valid agreement." Appellee counters that, when appellant paid appellee $260,000 for her one-half interest in the Billow Row and Crows Nest residences, the parties agreed that the money and the house purchased therewith were the nonmarital property of appellee. She argues in the alternative that, if there was no valid agreement, the Billow Row and Crows Nest residences should be classified as marital property as well.

The court reasoned as follows:

According to [appellant] both the Billow Row and the Crows Nest interest of the [appellee] was in exchange for the two hundred and sixty thousand dollars ($260,000.00). Therefore, the [c]ourt determines that Billow Row and Crows Nest is [sic] non-marital property, each property belonging to [appellant]. Clarkson Drive property. This is the property that [appellee] purchased with the money she received in exchange for Billow Row and Crows Nest. Court finds

that this is non-marital property. Clarkson Drive belongs to [appellee].

The evidence supports a finding that these properties were, in the words of F.L. § 8–201(e), "excluded by valid agreement." The exchange between the parties was a distribution of property intended to be separate from any judicial determination of a monetary award. Consequently, the court did not err in classifying these properties as nonmarital.

## III

Appellant next contends that the trial court erred in ordering that he "transfer his right, title, and interest in the [Chrysler] van to [appellee]." The van was titled solely in appellant's name and the parties stipulated that the van was nonmarital. Appellant points out that F.L. § 8–202(a)(3) prohibits a court from transferring the ownership of property between parties. Appellee responds that appellant's counsel twice consented to such a transfer, giving the court authority to order the transfer of title.

On the day the trial court announced its decision, the parties' counsel discussed with the court a document listing the issues on which they had reached agreement. The following colloquy occurred:

[APPELLANT'S COUNSEL]: [T]here was an issue about the value of the Chrysler van. If I can refresh your recollection, the Chrysler van belongs to [appellant]. . . . *We told Your Honor that we would convey it.* The agreement was it would be valued at eight thousand dollars ($8,000.00) and . . . if the [c]ourt grants a monetary award, we would get a credit for the eight thousand dollars ($8,000.00) that is being conveyed with title to the van under the [c]ourt's Order.

. . .

[APPELLEE'S COUNSEL]: I just wanted to comment on the automobile. . . . [W]e did work out the value, but I didn't want the [c]ourt to gain the impression that we felt

it neccessarily [sic] should be some sort of offset against . . . the monetary award. . . .

. . .

[APPELLANT'S COUNSEL]: [W]e still . . . think that the [c]ourt ought to, and *we consent to it as part of the [c]ourt's Order*, to transfer the van [and] whatever equitable consideration you give to that you give to that.

The court later stated in its decision that "[appellee] has primary physical custody of the children by this Order, and she needs the van for the children's benefit. I did not therefore compute the eight thousand dollars ($8,000.00) value as an offset. Court orders that [appellant] transfer his right, title, and interest in the van to [appellee]."

 Family Law § 8–202(a) "denies the court the power to transfer property, other than money, as a part of an award." *Droney v. Droney,* 102 Md.App. 672, 690, 651 A.2d 415 (1995) (citation omitted). We stated in *Fox v. Fox,* 85 Md.App. 448, 584 A.2d 128 (1991), therefore, that *"[a]bsent consent of the parties,* ordering the . . . transfer of the husband's property to the wife, instead of increasing the monetary award *pro tanto,* was improper." *Id.* at 453 n. 2, 584 A.2d 128 (emphasis added). On the other hand, "the court can merge the terms of a deed, agreement, or settlement made between the parties during the divorce as part of the divorce decree." *Droney,* 102 Md.App. at 690, 651 A.2d 415 (citing F.L. § 8–105(a)). In the case *sub judice,* the court ordered the transfer of the van only with appellant's consent, stated twice by his attorney in open court. Though appellant's counsel first conditioned the consent on the recognition of the van's value as an offset to any monetary award, his second statement made clear that appellant consented to the transfer regardless of whether such an offset was made. The court did not err in ordering appellant to transfer the van to appellee.

## IV

Appellant next contends that the trial court erred in granting appellee indefinite alimony. He argues that appellee's job

prospects are good and that the parties' projected incomes are not so disparate as to meet the statutory requirement for awarding indefinite alimony. Appellee responds that the parties' future standards of living, especially considering appellant's significant assets, will be unconscionably disparate.

The court, in deciding the issue of alimony, methodically went through the factors required to be considered by F.L. § 11–106(b) in determining the alimony award. It specifically found that appellee "has the ability to be wholly self-supporting once she gets a job in her field of special education," but that appellee could not be expected to begin work until the next school year. It found that, during the twelve-year marriage, the parties "lived well, upper class, but not extravagantly" and, that both parties contributed equally to the well being of the family. With regard to the circumstances that led to the parties' estrangement, the court repeated its reliance on the grounds of a two-year separation in granting the divorce, further stating that "there appear[s] to have been mistakes made on both sides." Both parties were in their early forties. Though the court noted that appellee "had been suffering from certain anxieties stemming from the divorce," it did "not consider this to be an impediment to working . . . outside the home." The court found that appellant had the ability to meet his own needs as well as those of appellee and their children, due to his annual income of "in excess of a hundred thousand dollars," his "two and a half to three million dollars in investments," his lack of debt, and the fact that "[h]e does not live extravagantly." Appellee had "in excess of a hundred and fifty thousand dollars" in assets, including an IRA and the equity in the home in which she and the children reside.

The court awarded appellee $4,100 in monthly rehabilitative alimony until October 1, 2000 because "by then [appellee] will have secured a job, if in fact she obtains one." Permanent monthly alimony of $1,200 was also awarded

> because of the dispirit [sic] standards of living, and taking into account, based on the testimony what the reasonable income that [appellant] could . . . make at her employment, and that [appellant's] assets are eight to ten times greater

than [appellee's]. And as I said, [appellant] makes approximately three times more than [appellee] could make if she even got a job.

Though the court made no specific finding as to appellee's projected income, uncontroverted evidence was presented that there was a strong demand for certified special education teachers and that appellee's previous experience would place her starting salary at approximately $37,000.

Under Maryland law, "the purpose of alimony [is] not to provide a lifetime pension but to facilitate a transition for the parties from the joint married state to the separate single one...." *Blaine v. Blaine*, 336 Md. 49, 64, 646 A.2d 413 (1994) (internal quotation omitted). Alimony should not be seen as "enabling the dependent spouse to maintain the standard of living enjoyed during the marriage"; rather, "the dependent spouse should be required to become self-supporting, even if that results in a reduced standard of living." *Id.* at 69, 646 A.2d 413. The law thus favors rehabilitative alimony over indefinite alimony. *Id.* On the other hand, "the provisions for indefinite alimony serve as a restraint upon the doctrine of rehabilitative alimony, protecting the formerly dependent, and less financially secure, spouse from too harsh an existence after the divorce." *Id.* at 70, 646 A.2d 413 (citing *Tracey v. Tracey*, 328 Md. 380, 391–92, 614 A.2d 590 (1992)).

Family Law Article § 11–106(c) provides that the court may award indefinite alimony in only two circumstances. The first addresses the infirmity or disability of one of the parties, which is inapplicable here. The second applies when the party seeking alimony makes "as much progress toward becoming self-supporting as can reasonably be expected, [but] the respective standards of living of the parties will be unconscionably disparate." F.L. § 11–106(c)(2). We review a court's finding of unconscionable disparity under the clearly erroneous standard of Md. Rule 8–131(c). An award of alimony based on such a finding will be overturned only if the court abused its discretion. *Roginsky v. Blake–Roginsky*, 129 Md. App. 132, 143, 740 A.2d 125 (1999). In fact, the court is given

such broad discretion on this issue that we have reversed a trial court's award of indefinite alimony only once in a published opinion. *See Ware v. Ware,* 131 Md.App. 207, 229, 748 A.2d 1031 (2000) (citing *Roginsky,* 129 Md.App. 132, 740 A.2d 125 (1999)).

The determination of whether the parties' standard of living will be "unconscionably disparate" under the statute "requires a projection into the future, based on the evidence, ... to the point when maximum progress [toward self-sufficiency] can reasonably be expected." *Roginsky,* 129 Md.App. at 146, 740 A.2d 125. The trial court should examine the numerical disparity between the parties' projected incomes and make a determination whether that disparity is unconscionable. *See Ware,* 131 Md.App. at 229–30, 748 A.2d 1031 (2000). "Although a significant mathematical disparity in income, present and future, is not necessarily a sufficient condition to justify an award of indefinite alimony, it is nonetheless a necessary condition." *Id.*

In the case *sub judice,* the trial court found that appellant's income, at that time $100,000, was "approximately three times more" than appellant's potential income. We assume the court calculated this figure using the potential teaching salary of approximately $37,000, provided by appellant's expert witness. The actual percentage for comparison purposes, then, is 37%. This salary ratio is well within the range of those we have previously upheld as unconscionably disparate. *See, e.g., Ware,* 131 Md.App. at 230–32, 748 A.2d 1031 (upholding the trial court's finding of unconscionable disparity where wife's potential income was 25.3% of husband's); *Digges v. Digges,* 126 Md.App. 361, 388, 730 A.2d 202 (1999) (affirming a finding of unconscionable disparity where wife's potential income was 30% of husband's); *Caldwell v. Caldwell,* 103 Md.App. 452, 464, 653 A.2d 994 (1995) (affirming the trial court's determination that a wife earning 43% of her husband's salary presented an unconscionable disparity).

Appellant rightly points out that the inquiry does not end with a calculation of the numerical disparity in incomes. As

we stated in *Blaine,* "the disparity must be 'unconscionable,' a determination which requires the application of equitable considerations on a case-by-case basis, consistent with the trial court's broad discretion in determining an appropriate award." *Blaine,* 336 Md. at 71–72, 646 A.2d 413. The "equitable considerations" include those enumerated in F.L. § 11–106(b). *See id.* at 72, 646 A.2d 413. The trial court made explicit factual findings with regard to each statutory factor and the record indicates that it made the award based on these factors. The court thought it particularly important that there was a significant disparity, not only in the parties' potential income, but in their assets. Though appellant asserts that the parties' assets are not a proper consideration in the alimony determination, F.L. § 11–106(b)(11) requires the court to consider "the financial needs and financial resources of each party, including: (i) all income *and assets* . . . ." (Emphasis added.) The court neither erred in determining that there was an unconscionable disparity in the parties' potential earnings nor abused its discretion in awarding appellee permanent alimony on the basis of that finding.

Appellee further argues that the court erred in not making a specific finding as to appellee's projected income. The court's statement that appellant "makes approximately three times more than [appellee] could make," is sufficient; however, because it is not the projected income *per se* but the disparity in incomes that is significant. Appellant also relies on *Roginsky* for the proposition that the parties' pre-marriage standard of living is "a relevant consideration," and that the court's alimony award was improper because there was insufficient testimony on this subject. We first note that, if appellant thought such evidence was necessary to the court's decision, he would have been well served to present it at trial. In *Roginsky,* moreover, our insistence that the trial court consider "the disparity in the standard of living [that] preexisted the marriage," was occasioned by the presence in that case of evidence of such a disparity. *Roginsky,* 129 Md.App. at 147–48, 740 A.2d 125; *see Ware,* 131 Md.App. at 233–35, 748 A.2d 1031 (discussing the "unusual circumstances" leading to rever-

sal in *Roginsky* ). When the parties in *Roginsky* met, the husband held a doctorate in theoretical nuclear physics and was employed by the federal government and the wife was "poor and surviving by operating a small restaurant" in Jamaica. *Id.* at 143–44, 740 A.2d 125. There is no evidence in this case of a gross disparity such as that in *Roginsky*.

## V

Appellant also contends that the trial court erred in calculating the child support award, first, by failing to deduct the alimony payment from his income and, second, by failing to assess any potential income to appellee. We begin by observing that the court did, in fact, deduct the alimony payment from appellant's income when calculating child support.[4]

When calculating each parent's obligations under the child support guidelines, the trial court must determine the amount of each party's income. "Income" is defined, in this context, as the "actual income of a parent, if the parent is employed to full capacity," F.L. § 12–201(b)(1), or the "potential income of a parent, if the parent is voluntarily impoverished," F.L. § 12–201(b)(2). We stated in *Reuter v. Reuter*, 102 Md.App. 212, 649 A.2d 24 (1994), that

> [b]efore an award may be based on potential income, the court must hear evidence and make a specific finding that the party is voluntarily impoverished. *John O. v. Jane O.*, 90 Md.App. 406, 423, 601 A.2d 149 (1992). Once a court reaches that conclusion, the court must then make findings regarding the factors related to potential income. *Goldberger v. Goldberger*, 96 Md.App. 313, 327–28, 624 A.2d 1328 (1993).

*Id.* at 221, 649 A.2d 24. The court's rulings on both of these issues will not be disturbed absent an abuse of discretion. *Id.*

---

4. The court found that appellant's monthly income was $9,187, which is also the total family income. Appellee's percentage share was 44.6% (monthly alimony—or $4,100—divided by total income) and appellant's share was 55.4% (income less alimony—or $5,087—divided by total income).

In the case *sub judice,* the issue of voluntary impoverishment was never raised at trial, nor was the possibility of attributing potential income to appellee in calculating child support. Assuming, however, that the issue has not been waived, we find that the trial court did not abuse its discretion in not ruling that appellee was voluntarily impoverished.

"[A] parent shall be considered 'voluntarily impoverished' whenever the parent has made the free and conscious choice, not *compelled* by factors beyond his or her control, to render himself or herself without adequate resources." *Goldberger v. Goldberger,* 96 Md.App. 313, 327, 624 A.2d 1328 (1993) (emphasis added). Evidence was presented at trial that appellee had turned down substitute teaching jobs repeatedly, had failed to return on the second day of a permanent job that was offered to her, and had limited the schools she was considering to those with schedules identical to her daughters' school. Appellee testified, however, that she had taken these actions to provide emotional support to her daughters following the divorce and that they were in a fragile state. The trial court granted appellee more than one year of rehabilitative alimony because it found that it was unreasonable to expect her to gain employment before then. The court also found that "it would be in the children's best interest for [appellee] to wait until the following school year." The court explicitly concluded that appellee's lack of employment was due to circumstances beyond her control.

## VI

Appellant next contends that the trial court erred in making a combined alimony and child support award that constitutes 70.5% of his net income. He argues that the award "was excessive," that it leaves him "with insufficient income to live on," and that it "is punitive and against public policy."

The trial court attributed to appellant a monthly income of $9,187, the gross income listed on the financial statement submitted by appellant. The financial statement lists appel-

lant's net monthly income as $7,603. The court ordered appellant to pay $4,100 per month in rehabilitative alimony and $1,249 in monthly child support, for a monthly total of $5,349, which is 58.2% of appellant's gross income, or 70.5% of appellant's net income. This leaves appellant with $2,254 per month for his own expenses, less than the $2,340 he listed for monthly expenses on his financial statement. We note, however, that this latter figure included $255 attributed to "House Payment," although the evidence showed, and the court found, that none of appellant's real estate properties was encumbered by a mortgage. Moreover, the rehabilitative alimony in the amount of $4,100 was awarded only for a period of sixteen months from June 1999 to October 2000, after which permanent alimony would be $1,200; appellant is certainly in a position to afford payment of a total of $65,600 over sixteen months, given the extensive value of his estate. Furthermore, after the period of rehabilitative alimony ends, appellant's total payment will be only 32.2% of his net income. Given the husband's testimony regarding his frugal lifestyle and the court's findings that the children engaged in expensive hobbies and had extraordinary medical and dental expenses, we do not think the total award amount constitutes an abuse of discretion.

## VII

 Appellant further contends that the trial court erred in refusing to consider granting him a dependency tax exemption. Appellee agrees that the court should have considered the issue of such an exemption. After appellant's counsel informed the trial court that the parties had a disagreement as to which party would be entitled to the dependency exemption, the court stated, "let me tell you what I usually do with regard to exemptions. I usually refer to the I.R.S. laws and whoever is entitled to the exemptions takes them ..., because that's not ... a law issue from ... the [c]ourt's point of view, that's an I.R.S. issue.... It's not my prerogative...."

We stated in *Wassif v. Wassif,* 77 Md.App. 750, 551 A.2d 935 (1989), that the trial court has the power to decide which

parent will receive a dependency exemption on his or her taxes. *Id.* at 761, 551 A.2d 935. If necessary to effectuate that decision, "a custodial parent may be ordered to execute the necessary waiver of a dependency exemption in favor of a non-custodial parent who is paying child support." *Id.*

 The trial court made a mistake of law when it concluded that it was not empowered to grant the tax exemption to one parent or the other and we thus remand the case for a determination of who should receive the exemption. In doing so, we instruct the court that, if it grants the exemption to the noncustodial parent, it must state its reasons for doing so. *Scott v. Scott,* 103 Md.App. 500, 522, 653 A.2d 1017 (1995). The savings to the party benefitting from the exemption must be considered when determining the party's income and applying that income to the child support guidelines, *id.;* the court must therefore reconsider its ruling on child support if the exemption is granted to appellant.

## VIII

Appellant finally contends that the trial court erred in granting appellee an award of counsel fees. He argues that, because the court based its decision on F.L. § 12–103, which provides for awards of "counsel fees that are just and proper under all the circumstances in any case in which a person: (1) applies for a decree ... concerning the custody, support, or visitation of a child of the parties," the court should have awarded appellee only those counsel fees that were incurred working on the issues of custody or child support. Appellant notes that the proper basis for an award of counsel fees in a case involving alimony is F.L. § 11–110, which provides that, "in a proceeding under [Title 11, "Alimony,"], the court may order either party to pay to the other party ... the reasonable and necessary expense of prosecuting or defending the proceeding."

 Under F.L. § 12–103, which the court cited, the following factors must be considered before awarding counsel fees: "(1) the financial status of each party; (2) the needs of

each party; and (3) whether there was substantial justification for bringing maintaining, or defending the proceeding." These factors are phrased slightly differently in F.L. § 11–110; there the court is required to consider "(1) the financial resources and financial needs of both parties; and (2) whether there was substantial justification for prosecuting or defending the proceeding." As we stated in *Lemley v. Lemley,* 109 Md.App. 620, 675 A.2d 596 (1996), "[u]nder either provision, the chancellor must undertake the same investigation before making an award of attorney's fees." *Id.* at 633, 675 A.2d 596.

In the case *sub judice,* although the court mentioned only F.L. § 12–103 and not F.L. § 11–110, it considered the factors required for an award of counsel fees under both sections. The court found that both parties were justified in the proceeding, but noted "the incredible unequal financial status of the parties and the high monetary fees." After observing that "both attorneys ... have done an admirable, better than admirable, ... a wonderful job in representing their respective clients," the court ordered appellant to pay $54,750 in counsel fees. The trial court having explicitly considered all of the factors required by both statutory provisions, its failure to cite both sections did not constitute an error of law or an abuse of discretion.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID THREE–FOURTHS BY APPELLANT AND ONE–FOURTH BY APPELLEE.**