Ann McGeehan v. Michael McGeehan, No. 93, Sept. Term, 2016. Opinion by Battaglia, J.

**MARRIAGE AND COHABITATION – AGREEMENTS CONCERNING MARRIAGE – POSTNUPTIAL AGREEMENTS – PROPERTY DISPOSITION IN DIVORCE – MD. CODE ANN., FAM. LAW § 8-201(e)(3)(iii)**

Under Section 8-201(e)(3)(iii) of the Family Law Article of the Maryland Code, which permits a valid agreement to exclude property acquired during the marriage from marital property, a valid postnuptial agreement does not require language that reclassifies property as nonmarital in order to exclude that property from marital property in divorce.

Circuit Court for Howard County
Case No: 13-C-14-101752
Argued: June 2, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 93

September Term, 2016
_____

ANN MCGEEHAN

v.

MICHAEL MCGEEHAN
_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Getty,
Battaglia, Lynne A. (Senior Judge,
Specially Assigned),

JJ.
_____

Opinion by Battaglia, J.
Getty, J., concurs.
_____

Filed: August 10, 2017

We are asked to consider whether an agreement entered into during the course of a marriage made manifest by three deeds by which title was transferred to the wife, Ann McGeehan, Petitioner, by her husband, Michael McGeehan, Respondent, was sufficient to exclude those properties from consideration as marital property under Section 8-201(e) of the Family Law Article of the Maryland Code (1984, 2012 Repl. Vol.).[1] We granted certiorari to address the following question:

> Did the Court of Special Appeals err in affirming the trial court's determination that the parties' oral agreement, with consideration, that property deemed Wife's sole and separate property did not constitute a "valid agreement" under the requirements of [the Family Law Article] § 8-201(e)?

*McGeehan v. McGeehan*, 451 Md. 580 (2017).

In October of 2014, Ann and Michael McGeehan separated after an eighteen year marriage, during which they had eight children. Two months later, Mr. McGeehan filed for divorce in the Circuit Court for Howard County, and an acrimonious debate ensued, which culminated in a divorce in December of 2015. The one year battle consumed

---

[1] All references to the Family Law Article are to Maryland Code (1984, 2012 Repl. Vol.), unless otherwise noted. Section 8-201(e) of the Family Law Article provides:
> (e) *Marital property.* — (1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.
>     (2) "Marital property" includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.
>     (3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:
>         (i) acquired before the marriage;
>         (ii) acquired by inheritance or gift from a third party;
>         (iii) excluded by valid agreement; or
>         (iv) directly traceable to any of these sources.

volumes of the record, but our analysis will be focused on only that which engenders the discussion of three pieces of real property: property located on Embassy Park Road in Washington, DC ("Embassy Park"), purchased in December of 1998 and titled initially in both names as tenants by the entirety; another property located in Mason Neck, Virginia ("Mason Neck"), purchased in 2000 and titled initially in the husband's name; and property located on Farside Road in Ellicott City, Maryland ("Farside"), purchased in 2002 and titled as tenants by the entirety.

A fourth property located at Log Jump Trail in Ellicott City, Maryland ("Log Jump"), purchased in September of 2013 by the McGeehans and titled as tenants by the entirety is relevant, because proceeds of sales of the Farside and Embassy Park properties apparently were rolled into the Log Jump purchase. Only the Log Jump and Mason Neck properties were owned by the parties at the time of their divorce.[2]

The present dispute between the parties before us was queued up in April of 2005 when a series of events occurred that were encapsulated by the Circuit Court Judge in her findings:

> [I]n the year 2000, wife learned the husband had taken $50,000 out of her sole bank account without her knowledge or permission to purchase a piece of property in [Mason Neck], Virginia. Husband told her afterward he had taken the money to purchase the property but wife now says she doesn't know if that's why he took the money.

---

[2] There is a reference to furniture at a "Whale Boat" property being marital property in the findings entered by the Circuit Court Judge. "Whale Boat" referred to Mr. McGeehan's leased residence.

The judge then discussed Mr. McGeehan's stock trading, which ultimately lead to the

April 2005 real property transactions:

> Husband testified he accessed many of wife's accounts and that she was aware that he did so since it was he who handled the family finances. In addition, he had changed the document that wife had signed to allow him to take $5,000 out of her premarital security account and he changed it to read $15,000. Throughout the parties' marriage, from time to time -- from the time husband worked for Merrill Lynch, husband would invest in the stock market. He made a lot of money early on but lost as much as he had earned when the dot com bubble burst. Husband discontinued stocking trading for a period of time when the family lived in Europe but resumed in about 2008 and continued to trade for several years. His last trade was about six months ago. It appears from the evidence that husband has lost significantly more in the stock market than he has profited.

The judge then described the circumstances of the transfer in April of 2005 that

lead to this embroilment:

> In 2005, wife discovered that husband had been trading her premarital stock account and she discovered that when she got a tax bill from the State of Virginia for over $592,000. This was a time of crisis for the couple and at that time it led them both to contemplate the future of their marriage. Wife made a new will leaving everything to her children and had her family's estate attorney write up a waiver of the statutory share for her husband to sign. Wife lost trust in husband, demanded that he transfer the parties' Embassy Park Drive home, Farside home in Ellicott City and the property in Virginia into her sole name. Husband alleges that this was done for estate planning purposes due to his risky employment but it's more credible that it was done to appease wife who was distraught over losing her inherited stock portfolio. The parties continued in the marriage after this. Husband continued to be in charge of the parties' finances.

The judge also found that, "All of the premarital funds had been co-mingled at that

point."

The gravamen of the question raised by Ms. McGeehan, however, arises as a result

of the judge's determination that the Mason Neck property retitled in 2005 to Ms.

McGeehan's name was marital property:

3

The [Mason Neck], Virginia property was disputed property. It was initially titled in husband's name. It was transferred to wife's name in 2005 at a time when wife had recently learned her premarital estate had been traded away in the stock market. It would seem that it was the parties' mutual agreement that the property would be wife's property. Under the law of Maryland, even though property is titled in the name of one party or another party, it remains marital property and can be excluded by agreement of the parties. But the law is clear that to do that, and I just learned this, the agreement has to be specific not just that it's my sole and separate property but it is my sole and separate property and will be excluded from marital property in the future. It has to be explicitly stated. It was not explicitly stated. I've seen no evidence that it was. So, under the cases of *Golden versus Golden* and *Falise versus Falise*, the property is now marital. However, it's titled in wife's name. Wife is the only person as the titled owner who can give an opinion as to its value and since the property was not appraised, I have to find that the value of that property is $600,000.00.

The Judge also determined that the Log Jump property, titled as tenants by the entirety upon purchase, was marital property, without any discussion of whether any portion of it was excluded by valid agreement or any consideration of its financial underpinnings or source of funds[3]:

---

[3] Under the source of funds theory, property that is acquired by an expenditure of both nonmarital and marital funds is characterized as part nonmarital and attributed to the contributing spouse, and part marital, subject to equitable distribution. *Harper v. Harper*, 294 Md. 54, 80 (1982). Log Jump, as jointly titled property, may have been properly determined to be marital property under Section 8-201(e)(2) of the Family Law Article, in the absence of a valid agreement to exclude it as nonmarital property. If Farside and Embassy Park were nonmarital properties, however, any contribution of their proceeds to Log Jump's purchase should also have been considered in the trial judge's determination of the monetary award under Section 8-205(b)(8)–(9) of the Family Law Article. Section 8-205(b)(8)–(9) of the Family Law Article provides:

(b) *Factors in determining amount and method of payment or terms of transfer. —* The court shall determine the amount and the method of payment of a monetary award . . . after considering each of the following factors . . .

(8) how and when specific marital property or interest in property described in subsection (a)(2) of this section, was acquired, including the effort expended by

(continued . . . )

There is a house on Log Jump Trail, 11640 Log Jump Trail. It is titled tenants by the entireties. It is marital property. Its value is $1,568,200.00. There is a debt against that property of $445,000. So the value of that property is . . . $1,123,200.

The "gift deed" executed and recorded in 2005 between the McGeehans with respect to the Mason Neck property conveyed the property to Ms. McGeehan as her "sole separate and equitable estate":

> **THIS DEED**, made and entered into this 11th day of April, 2005, by and between Michael S. McGEEHAN, a married man, GRANTOR, and Ann O. McGEEHAN, a married woman, as and for her sole separate and equitable estate, GRANTEE:
> **WHEREAS**, Michael S. McGeehan acquired an interest in the property described herein by deed dated May 5, 2000 and recorded May 8, 2000, in Deed Book 11343 at Page 1378, among the land records of Fairfax County, Virginia; and
> **WHEREAS**, Michael S. McGeehan, Grantor, desires to convey all his rights, title and interests in said property described herein to his wife, Ann O. McGeehan, the Grantee, in fee simple.

The "gift deed" conveying the couple's Embassy Park property to Ms. McGeehan similarly provided that the property would be "her sole separate and equitable estate":

> **THIS DEED**, made and entered into this 11th day of April, 2005, by and between Michael S. McGEEHAN, a married man, GRANTOR, and Ann O. McGEEHAN , a married woman, as and for her sole separate and equitable estate, GRANTEE:
> **WHEREAS**, Michael S. McGeehan acquired an interest in the property described herein along with his wife An [sic] O. McGeehan, as tenants by the entirety with full common law right of survivorship, by deed dated November 18,

---

( . . . continued)
> each party in accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;
> (9) the contribution by either party of property described in § 8-201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety . . . .

1998 and recorded December 2, 1998, as Instrument Number 9800092930, among the land records of the District of Columbia; and

**WHEREAS**, Michael S. McGeehan, Grantor, desires to convey all his rights, title and interests in said property described herein to his wife, Ann O. McGeehan, the Grantee, in fee simple.

With respect to the Farside property, the deed transferring the property from "Husband and Wife to Wife"[4] provided:

**This Deed**, made this 11th day of April, 2005, by and between MICHAEL S. MCGEEHAN and ANN O. MCGEEHAN, parties of the first part, Grantors; and ANN O. MCGEEHAN, party of the second part, Grantee.
– **Witnesseth** –
THIS IS A TRANSFER FROM HUSBAND AND WIFE TO WIFE AND IS EXEMPT UNDER 12-1098(d) OF TAX PROPERTY ARTICLE OF THE ANNOTATED CODE OF MARYLAND.
THAT for an in consideration of the sum of NO AND 00/100 DOLLARS ($.00), which includes the amount of any outstanding Mortgage or Deed of Trust, if any, the receipt whereof is hereby acknowledged, the said Grantors do grant and convey to the said ANN O. MCGEEHAN, as sole owner, in fee simple, all that lot of ground situate in Howard County, Maryland . . . .

At trial, Ms. McGeehan testified that the Embassy Park property was sold in "2012 or 2013," and the proceeds from that sale yielded "a little bit more than $400,000.00":

Q. Now, concerning the property on Embassy, there came a time when you sold that, right?
A. Yes.
Q. The D.C. property. And to the best of your recollection, approximately when was that home sold?

---

[4] The Deed iterated that the transfer was "EXEMPT UNDER 12-1098(d) OF TAX PROPERTY ARTICLE OF THE ANNOTATED CODE OF MARYLAND." This statement apparently referred to Section 12-108(d) of the Tax Property Article of the Maryland Code (1985, 2001 Repl. Vol.), which provided, "An instrument of writing that transfers property between spouses or former spouses is not subject to recordation tax."

A. To the best of my recollection, around it was the summertime, it was either 2012 or 2013. And then it went into escrow, the proceeds, while I looked for an investment property.

Q. Now and do you remember what the approximate amount was from the proceeds of the sale of that property?

A. Approximately $440,000.00. Around $400,000.00, a little bit more than $400,000.00. We had purchased it for $200,000.00 something it was . . . sold for about $650,000.00 and there was – and uh, yeah.

Ms. McGeehan further testified that Farside was sold in 2014, and the proceeds of Embassy Park and Farside were used to purchase Log Jump:

Q. And with regard to the purchase of your current property [Log Jump], were there uh, was any portion of the – well the property was sold, correct? The [Farside] property was sold?

A. Yes it was.

Q. And do you remember the approximate amount it was sold for?

A. It was approximately sold, approximately $800,000.00.

Q. And when it was sold do you know how the proceeds were applied, if at all, to the purchase of the Log Jump property?

A. My husband told me that we were rolling all of the proceeds into the Log Jump property because the Log Jump property was about – it's $400,000.00 more expensive and that was the same amount of the $439,500.00 proceeds. So we were combining in the two ultimately to move them –

Q. When you say combining the two, what two are you referring to?

A. In other words, the [Embassy Park] property, the properties are listed on my – the [Embassy Park] property, the properties are listed on my – the [Embassy Park] and the 11777 [Farside] Road. Both of those properties were sold. And both my understanding and what my husband definitively told me is that the full sum of those two properties which were in my name, would be transferred into the property to have a bigger house for the kids, you know, for us to live in.

The issue raised by Ms. McGeehan before us is, thus, queued up. Did the 2005 Mason Neck gift deed from Mr. McGeehan act not only to transfer title to Ms. McGeehan but also to remove Mason Neck from consideration as marital property? Likewise, did the 2005 deeds from husband to wife relating to Embassy Park and Farside make them nonmarital property, such that their subsequent sales and contribution of their proceeds to

the purchase of Log Jump render any portion of the value of Log Jump nonmarital? Although both parties present the decisions by the Court of Special Appeals in *Golden v. Golden*, 116 Md. App. 190 (1997), and *Falise v. Falise*, 63 Md. App. 574 (1985), as dispositive to our analysis, we, as will be seen, disagree.

Before the Court of Special Appeals, Ms. McGeehan raised a number of issues, among which she argued that Circuit Court Judge had erred in classifying Mason Neck and, implicitly, Farside as marital property because there was a "valid agreement" under Section 8-201(e) of the Family Law Article excluding the two pieces of real property from marital property.[5] Mr. McGeehan, conversely, contended that there had never been an agreement that Mason Neck and Farside, as well as Embassy Park, were nonmarital property, and, thus, Log Jump was appropriately designated as marital property. He argued that there was no evidence of an explicit agreement to designate Mason Neck as "nonmarital" and that, not only did the trial judge expressly find that Log Jump had been purchased with co-mingled funds, but, even if Farside and Embassy Park were wife's

---

[5] The five questions presented before the Court of Special Appeals by Ms. McGeehan were:
  I. Did the lower court err or abuse its discretion in allowing federal government to participate as a party in trial proceedings?
  II. Did the lower court err or abuse its discretion in determining child support, imputing income, and finding that Appellant voluntarily impoverished?
  III. Did the lower court err or abuse its discretion in failing to award use and possession of the marital home to wife?
  IV. Did the lower court err or abuse its discretion in its determination of marital and non-marital property and in its determination of a monetary award?
  V. Did the lower court err or abuse its discretion erred [sic] in failing to rule on motion to void deeds of trust recorded before merits trial by Appellee's counsel on the marital home titled as tenants by the entireties?

nonmarital property, the trial court had the discretion to ignore that fact in the determination of the monetary award.

The Court of Special Appeals agreed with Mr. McGeehan and relied on the trial court's rationale for its observation that:

> Although, as the trial court noted, the deed for the property and the oral agreement between the parties evidenced an intent to transfer the property into [Ms. McGeehan's] name alone, they did not express an intent to remove the Mason Neck property from marital property status or to exempt it from application of the Marital Property Act. The trial court, citing *Golden v. Golden*, carefully noted that that an agreement must explicitly state that the property is to be excluded from marital property and that the agreement between [Ms. McGeehan] and Mr. McGeehan had no such statement. The trial court concluded that the testimony and the documents did not support a finding that the parties were contemplating the future division of property and wanted to remove the Mason Neck property from the scope of the Marital Property Act. Similarly, the trial court did not believe that Ms. [McGeehan's] use of gift funds to pay off the mortgage converted Mason Neck into nonmarital property. We see no error in the trial court's analysis.

*McGeehan v. McGeehan*, September Term, 2015, No. 2445, at 13–14 (October 26, 2016).

Before us, Ms. McGeehan argues that the trial court misapplied *Golden* and *Falise* to require that the deeds needed to specify that the properties would be nonmarital and that the words "sole" and "separate" as well as "sole owner" contained in the deeds were not sufficient to exclude the properties from marital property. Mr. McGeehan, on the other hand, maintains that the transfers of the three properties to Ms. McGeehan did not constitute a valid agreement to exclude any portion of the value of the properties or proceeds from the sale of the properties from the marital cauldron, because the deeds and oral agreements were not specific enough to exempt them from marital property.

9

The gravamen of the Maryland property division scheme upon divorce is an attempt to ensure that the value of both real and personal property is distributed in a fair and equitable manner. Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law § 13-2 (6th ed. 2016).[6] The initial determination by a trial judge centers on whether the property is marital, such that its value is attributable to both spouses, or nonmarital and attributable to one spouse. Section 8-203(a) of the Family Law Article.[7] Once the values of the marital and nonmarital properties have been identified,[8] a monetary award is tabulated as an adjustment of the equities and rights of the parties concerning marital property:

> (a) *Grant of award.* — (1) Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may . . . grant a monetary award . . . as an adjustment of the equities and rights of the parties concerning marital property . . . .
>
> \*     \*     \*
>
> (b) *Factors in determining amount and method of payment or terms of transfer.* — The court shall determine the amount and the method of payment of a monetary award . . . after considering each of the following factors:
>> (1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;
>> (2) the value of all property interests of each party;

---

[6] All references to Cynthia Callahan & Thomas C. Ries' *Fader's Maryland Family Law* will be to the 2016 edition, unless otherwise noted.

[7] Section 8-203(a) of the Family Law Article provides, in pertinent part:
> (a) *Time of court action.* — In a proceeding for an annulment or an absolute divorce, if there is a dispute as to whether certain property is marital property, the court shall determine which property is marital property . . . .

[8] Section 8-204(a) of the Family Law Article provides:
> (a) *Determination by court.* — Except as provided in subsection (b) of this section, the court shall determine the value of all marital property.

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in property described in subsection (a)(2) of this section, was acquired, including the effort expended by each party in accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;

(9) the contribution by either party of property described in § 8-201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in property described in subsection (a)(2) of this section, or both.

(c) *Award reduced to judgment.* — The court may reduce to a judgment any monetary award made under this section, to the extent that any part of the award is due and owing.

Section 8-205 of the Family Law Article.

Section 8-201(e) of the Family Law Article defines "marital property," provides that real property titled as tenants by the entirety is marital property, unless excluded by valid agreement, and also allows all other property "excluded by valid agreement" to be excluded from marital property:

(e) *Marital property.* — (1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.

(2) "Marital property" includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.

(3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) excluded by valid agreement; or

(iv) directly traceable to any of these sources.

11

The statute, however, does not define what constitutes a "valid agreement."

What is now the language of Section 8-201(e)(3)(iii) of the Family Law Article, providing that property "excluded by valid agreement" is nonmarital, was enacted as part of the Maryland Property Disposition in Divorce and Annulment Act (the "Marital Property Act") by the General Assembly in 1978, which established our current statutory regime providing for the disposition of property in a divorce. 1978 Maryland Laws, Chapter 794. The language had been recommended by the Governor's Commission on Domestic Relations Laws (also known as the "Groner Commission," named after its chairperson Beverly Groner), appointed in 1976, in part, to propose changes to the Maryland laws governing the disposition of property in divorce. Report of the Governor's Commission on Domestic Relations Law, at 2 (1978).

With respect to the definition of "marital property," the Groner Commission recommended only one exclusion from the definition of marital property, that being property "excluded by valid agreement." *Id.* at 7. The Report of the Groner Commission, however, did not include any reference to where the language of valid agreement was derived, nor define what a "valid agreement" was. *Id.*

The General Assembly in Chapter 794 of the Maryland Laws of 1978 did follow the lead of the Groner Commission and provided that "property excluded by valid agreement" was not marital property, which was codified at Section 3–6A–01(e) of the Courts and Judicial Proceedings Article of the Maryland Code (1974, 1979 Supp.), with the addition of other exclusions:

"Marital property" is all property, however titled, acquired by either or both spouses during their marriage. It does not include property acquired prior to the marriage, property acquired by inheritance or gift from a third party, or property excluded by valid agreement or property directly traceable to any of these sources.

1978 Maryland Laws, Chapter 794.

One commentator at the time noted the significance of "permit[ting] the exclusion of property from the provisions of the statute if governed by a valid agreement," which elevated the role that antenuptial contracts would have in resolving property disputes upon divorce. Paula Peters, *Property Disposition Upon Divorce in Maryland*, 8 U. Balt. L. Rev. 377, 409 n.201 (1979) (noting that "practitioners should consider increased counseling and education in the field of antenuptial agreements" as a result of the enactment of the statute). This Court also recognized that as a result of the enactment of the "valid agreement" language, parties could "control the distribution of property upon divorce" through antenuptial agreements:

> Furthermore, the General Assembly has expressed the public policy of Maryland such that antenuptial agreements contemplating divorce are recognized, and hence not contrary to public policy. In 1978, the General Assembly enacted what is known as the Marital Property Act which concerns property distribution upon divorce. 1978 Md. Laws 794. Under the statute, the parties may agree what property is not to be considered marital property or family use personal property. Maryland Code (1974, 1980 Repl. Vol.), Cts. & Jud. Proc. Article, § 3–6A–01(c), (e). Through such agreements, the parties can control the distribution of property upon divorce.

*Frey v. Frey*, 298 Md. 552, 562 (1984).

13

In 1994, the General Assembly, in response to our decision in *Grant v. Zich*, 300

Md. 256 (1984), added a provision to the statute that real property held by spouses as

tenants by the entirety is marital property, unless "excluded by valid agreement" [9]:

> (e)(1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.
>     (2) "Marital property" includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.
>     (3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:
>                 (i) acquired before the marriage;
>                 (ii) acquired by inheritance or gift from a third party;
>                 (iii) excluded by valid agreement; or
>                 (iv) directly traceable to any of these sources.

1994 Maryland Laws, Chapter 462. In so doing, the General Assembly intended to

overrule *Grant v. Zich*, according to its bill analysis:

> This bill is directed toward the first step of the court's analysis of marital property. It overrules the holding in *Grant v. Zich*, in which the Court of Appeals ruled that in determining whether property held by the parties as tenants by the entirety should be characterized as marital property, a court must apply a source of

---

[9] By Chapter 296 of the Maryland Laws of 1984, the General Assembly repealed former Section 3–6A–01(e) of the Courts and Judicial Proceedings Article of the Maryland Code (1974, 1980 Repl. Vol.), and recodified the provision, with stylistic changes, as Section 8-201(e) of the Family Law Article of the Maryland Code (1984):
  (e) Marital property.
        (1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.
         (2) "Marital property" does not include property:
                    (i) acquired before the marriage;
                    (ii) acquired by inheritance or gift from a third party;
                    (iii) excluded by valid agreement; or
                    (iv) directly traceable to any of these sources.
1984 Maryland Laws, Chapter 296.

the funds analysis, and that the portion of the property that is directly traceable to funds or other property acquired before marriage is nonmarital property.

Senate Judicial Proceedings Committee, Bill Analysis of Senate Bill 41 (1994).

In abrogating *Grant v. Zich*, the General Assembly adopted the presumption that a tenancy by the entirety property was marital and could only be excluded as nonmarital by the execution of a valid agreement. Its value relative to the monetary award would continue to be subject to the rubric of Section 8-205(b) of the Family Law Article of the Maryland Code (1991 Repl. Vol., 1995 Supp.), to which was added a new factor in the same legislation.[10]

In so doing, the General Assembly recognized the importance of the legal analysis of a valid agreement to determine exclusion, rather than an initial analysis of the source of funds. Since the introduction of what is now Section 8-201(e)(2) of the Family Law Article, the Court of Special Appeals has decided in *Brown v. Brown*, 195 Md. App. 72, 107 n.18 (2010), in the only reported opinion addressing the validity of an agreement

---

[10] The General Assembly in 1994 also amended Section 8-205(b) of the Family Law Article of the Maryland Code (1984, 1991 Repl. Vol.), requiring the trial court to consider the nonmarital contributions of a spouse to property held as tenants by the entirety, among the other statutory factors, when determining the propriety and amount of a monetary award:

> (b) The court shall determine the amount and the method of payment of a monetary award . . . after considering each of the following factors:
>
> > (9) the contribution by either party of property described in § 8-201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety.

1994 Maryland Laws, Chapter 462.

under that section, that a jointly filed statement under Maryland Rule 9-207[11] designating

a tenancy by the entirety property as nonmarital could constitute a valid agreement to

exclude that property from marital property.

Each party before us, however, asserts that two cases, *Falise* and *Golden* need to

be considered to determine what the General Assembly intended in adopting the language

of valid agreement in Section 8-201(e)(3)(iii) of the Family Law Article. In *Falise*, the

Court of Special Appeals considered whether a clause in a separation agreement that

excluded real property acquired after separation, but before the divorce, was valid, in the

context of a husband having purchased property in his own name during that period,

reconciling with his wife, and retitling the property as tenants by the entirety. The

separation agreement in issue had provided that both spouses agreed to waive "all rights,

---

[11] Maryland Rule 9-207 provides, in relevant part:

(a) **When required.** When a monetary award or other relief pursuant to Code, Family Law Article, § 8-205 is an issue, the parties shall file a joint statement listing all property owned by one or both of them.

(b) **Form of Property Statement.** The joint statement shall be in substantially the following form:

JOINT STATEMENT OF PARTIES CONCERNING MARITAL AND NON-MARITAL PROPERTY

1. The parties agree that the following property is "marital property" as defined by Maryland Annotated Code, Family Law Article, § 8-201 . . .

\*     \*     \*

2. The parties agree that the following property is not marital property because the property (a) was acquired by one party before marriage, (b) was acquired by one party by inheritance or gift from a third person, (c) has been excluded by valid agreement, or (d) is directly traceable to any of those sources . . .

\*     \*     \*

3. The parties are not in agreement as to whether the following property is marital or non-marital . . .

title, interest and claims which said parties might now have or may hereafter have as the husband, wife . . . or otherwise, in and to any property, real or personal, that either of said parties may own or hereafter acquire. . . ." *Falise*, 63 Md. App. at 578 n.1. The agreement had been executed prior to the enactment of the Marital Property Act.

Attempting to address whether the separation agreement clause in issue constituted a valid agreement to exclude the property from consideration as marital property, the Court of Special Appeals observed that, "the parties intended to relinquish any and all right, title and interest in and to the other's property, then owned or thereafter acquired." *Id.* at 580. Regardless of the parties' intentions, however, our intermediate appellate court emphasized that the clause in the separation agreement could not anticipate the passage of the Marital Property Act. As a result, then, the Marital Property Act was in play, and the absence of reclassification language of the property as nonmarital was determinative that a valid agreement to exclude did not exist:

> The only real significance of the Agreement is in the relationship of [the clause] to the tract of land in Howard County upon which the Falises constructed the home at issue, *i.e.*, whether the tract itself constitutes marital or nonmarital property. That significance dissipates like a puff of smoke because even if the separation agreement was not abrogated, the unimproved lot of ground acquired by appellant during the separation must be classified as "marital" and not as "nonmarital" property.

> It is clear that by [the clause] of the agreement the parties intended to relinquish any and all right, title and interest in and to the other's property, then owned or thereafter acquired. We doubt that the subject agreement could affect the status of something which is neither an interest in real or personal property, i.e., marital property. Marital property is merely a term created by the legislature to describe the status of property acquired during the marriage, however titled (as defined in Md. Family Law Code Ann. § 8–201(e) (1984)), title to which may have given rise to a potential inequity, upon dissolution of the marriage. That inequity, conceptually, may be corrected via a different legislative creature called

17

the "monetary award." Thus, the only function of "marital property" is to form a base for a "monetary award." The legislature never intended that either spouse could have a legal interest in the "marital property" of the other since it merely intended to cure the title created inequity through the issuance of a "monetary award."

*Id.*

The holding in *Falise* then followed: "In order to exclude property 'by valid agreement' from the reach of a monetary award, we believe that the parties must specifically provide that the subject property must be considered 'non marital' or in some other terms specifically exclude the property from the scope of the Marital Property Act." *Id.* at 581. In so doing, the Court of Special Appeals enmeshed the notion of reclassification of the property as nonmarital into its interpretation of the language of valid agreement,[12] which has led to disparate results in interpreting separation agreements.

---

[12] We take a moment to note that there is a distinction between a valid agreement, which has been construed under contract principles, and reclassification. The distinction is important not only in terms of the holding in the present case, but for an understanding of the dichotomy observed in *Falise*. In drawing this distinction, we have reviewed the provisions and comments to the Uniform Marital Property Act (1983), which identifies statutory bases for exclusion from marital property including a marital property agreement or reclassification, among others.

Section 4 of the Uniform Marital Property Act (1983) defined "individual," or nonmarital, property as including property acquired "by a decree, marital property agreement, written consent, or reclassification . . . designating it as the individual property of the spouse. . . ." The Uniform Act's provisions and commentary separate the interpretation of a valid agreement from the concept of reclassification, a term which is not a part of the Maryland statutory scheme.

In assessing the validity of marital property agreements, Section 10(f)–(h) of the Uniform Marital Property Act (1983) suggested standards for enforcing marital property agreements made both during marriage and before marriage, based on various principles:

(continued . . . )

18

One such disparate result was occasioned in *Carsey v. Carsey*, 67 Md. App. 544, 553 (1986), in which the Court of Special Appeals evaluated whether a trial court's determination that a valid agreement existed to exclude property from marital property in favor of the wife, after the husband had provided a letter to her by which "all properties assigned jointly or under my name singularly are Nancy S. Carsey's privilege to dispose

( . . . continued)
　　(f) A marital property agreement executed during marriage is not enforceable if the spouse against whom enforcement is sought proves that:
　　　　(1) the agreement was unconscionable when made; or
　　　　(2) that spouse did not execute the agreement voluntarily; or
　　　　(3) before execution of the agreement, that spouse: (i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; (ii) did not voluntarily sign a written consent expressly waiving any right to disclosure of the property or financial obligations of the other spouse beyond the disclosure provided; and (iii) did not have notice of the property or financial obligations of the other spouse.
　　(g) A marital property agreement executed before marriage is not enforceable if the spouse against whom enforcement is sought proves that:
　　　　(1) that spouse did not execute the agreement voluntarily; or
　　　　(2) the agreement was unconscionable when made and before execution of the agreement that spouse: (i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; (ii) did not voluntarily sign a written consent expressly waiving any right to disclosure of the property or financial obligations of the other spouse beyond the disclosure provided; and (iii) did not have notice of the property or financial obligations of the other spouse.
　　(h) An issue of unconscionability of a marital property agreement is for decision by the court as a matter of law.

　　Reclassification, on the other hand, "is just what the word implies-it is a change in classification, generally from marital to individual or vice versa." Unif. Marital Property Act § 4 cmt. on classification (1983). Although the Act notes that "title does *not* function as a classification index," *id.*, "the provisions of the Act do not require any particular form of labeling of title-documented property. . . ." *Id.* § 11 cmt.
　　In raising the dichotomy between what is a valid agreement and a reclassification, we leave for a more appropriate case whether *Falise* continues to be valid in the context of a separation agreement.

of as she wishes," provided that wife took on the "responsibility for liabilities related to that estate." Our intermediate appellate court agreed that a valid agreement "respecting the ownership of property which by its terms justified a finding of no marital property," *id.* at 552, existed, contrasting *Falise* and applying traditional contract principles of offer, acceptance, consideration, and intent, as well as knowledge of the assets and voluntariness in its analysis:

> Unlike the parties in *Falise*, who, by a bilateral agreement, relinquished all right, title and interest in and to each other's property (known and unknown, then owned or thereafter acquired), Julian Carsey made a unilateral offer to Nancy Carsey whereby "all properties assigned jointly or under my name singularly are Nancy S. Carsey's privilege to dispose of as she wishes" if she undertook "responsibility for liabilities related to that estate." The trial judge found, and we agree, that Nancy, through her conduct, accepted the unilateral offer; ergo, a valid agreement. That valid agreement specifically authorized Nancy to dispose of the property as she pleased, thus manifesting a clear intent, albeit "in some other terms specifically [to] exclude the property from the scope of the Marital Property Act."[] Furthermore, in *Falise*, unlike here, the property sought to be excluded by the agreement was property acquired by the husband during the parties' separation pursuant to the agreement.
>
> Here, the trial court in effect found as a fact, and justifiably so, that the note and the tape transcript, when viewed in light of appellant's actions, evinced appellant's clear intent to be rid of the liabilities of marriage as well as the benefits; in short, appellant intended to completely sever any and all connections, present and future, he had with his marriage, i.e., to chuck it all for now, henceforth, and forevermore. Supplementing his words, appellant's conduct also reflected that he was offering to give up his marital rights to be free of his marital obligations, just as he was willing to give up property rights to be free of his debts. The supportive evidence is ample. The note and the transcript speak with unmistakable clarity. And appellant's actions provide the exclamation point: he was fully aware of the parties' assets; his leaving was volitional, not coerced; aside from leaving without a hint of warning, so far as the record reveals, during the more than two years from departure to the filing of his answer to appellee's divorce action and his counter-bill for divorce, he never communicated with appellee; and, even more to the point, he neither inquired nor evidenced any concern about the property he now claims to be marital property. Furthermore, appellant himself testified that before leaving, among other things, he decided his marriage was over and should be dissolved and, having made that decision, he left.

20

Given these facts, we are unable to say that the trial court's finding was erroneous, much less clearly so.

*Id.* at 553–54.[13]

In *Thomasian v. Thomasian*, 79 Md. App. 188 (1989), however, our intermediate appellate court considered whether property acquired during the couple's separation, but before divorce, and titled in husband's sole name was marital, although it was unclear from the trial court's ruling whether it had considered that property as marital or nonmarital. The Court of Special Appeals noted, relying on the language of *Falise*, that, "In order to be effective, the agreement must be sufficiently specific as to make clear that the property is to be 'non marital' or, in some other terms, specifically exclude the property from the scope of the Marital Property Act." *Id.* at 203. Observing that, the "record does not reflect any such agreement," *id.*, the court remanded the issue to the trial court.

In *Harbom v. Harbom*, 134 Md. App. 430 (2000), the Court of Special Appeals considered the validity of a separation agreement, as well as of a postnuptial agreement and an antenuptial agreement, to exclude property as nonmarital, as discussed more fully *infra*. With respect to the separation agreement, our intermediate appellate court considered whether real property, purchased with funds that wife had received from husband in exchange for her one-half interest in their jointly owned real property, after

---

[13] We note, further, that in a case where the statute was not applied in *Williams v. Williams*, 306 Md. 332 (1986), we assessed the validity of a separation agreement, which provided for the disposition of certain real property, based on the concept of unconscionability, a traditional contract defense.

their separation but before divorce, was nonmarital, pursuant to a valid agreement to exclude. In determining that the agreement to exchange was a valid agreement to exclude, the Court of Special Appeals did not rely on the *Falise* tenets, but determined: "The exchange between the parties was a distribution of property intended to be separate from any judicial determination of a monetary award. Consequently, the court did not err in classifying these properties as nonmarital." *Id.* at 454.

In *Flanagan v. Flanagan*, 181 Md. App. 492 (2008), our intermediate appellate court considered whether property not identified in the couple's joint statement of marital and nonmarital property, but discussed during trial, was marital, such that it should have been considered in the calculation of the total value of marital property. The joint statement had only identified four items of marital property but contained a clause that stated, "The parties agree that all issues with regard to the remaining property that they hold have been resolved." *Id.* at 499. Observing that the trial court had not erred in calculating the value of parties' marital property based on the four items identified in the joint statement, the Court of Special Appeals interpreted the clause as affecting a valid exclusion from marital property with respect to any remaining property, even though the property had not been classified as nonmarital:

> An agreement such as the one set forth in the parties' joint statement, that "all issues with regard to the remaining property that they hold have been resolved," when articulated in a Rule 9-207 statement, meets the criteria explicated in [*Falise*]: it "specifically exclude[s] the property from the scope of the Marital Property Act," and thus removes the property from the marital property pool that is subject to division. If it were otherwise, the purposes underlying Rule 9-207 would be thwarted, because the parties' joint statement would not narrow the issues before the chancellor.

Accordingly, an agreement reflected in a joint statement under Rule 9-207, to the effect that the parties have resolved the disposition of certain marital property, serves to render that property non-marital, pursuant to F.L. § 8-201(e)(3)(iii).

*Id.* at 531–32 (citation omitted).

It certainly goes without saying that the Court of Special Appeals in the instant case applied the *Falise* rationale requiring language of reclassification of the property as nonmarital to effect an exclusion from marital property, even though we are not dealing with a separation agreement. It is not a given, however, that *Falise* should be applied in the context of a postnuptial agreement, as in the present case, as we shall discuss.

Before discussing antenuptial and postnuptial agreements, however, we turn to *Golden*, the second case highlighted by the parties. In *Golden*, the Court of Special Appeals only decided that the trial court had erred in finding the existence of an oral agreement entered into premaritally that essentially iterated "what was hers was hers and what was mine was mine," based upon conduct that showed "before and after marriage, these parties, with the exception of the joint account for household expenses, handled their money and their investments as though unmarried." *Golden*, 116 Md. App. at 193.

Our intermediate appellate court in *Golden* disagreed and posited, "We perceive that the finding of an oral property settlement agreement was erroneous. We perceive of nothing in the testimony or evidence in this case that would constitute an agreement sufficient to bind the parties to it or to support the trial judge's finding." *Id.* at 201–2. Judge Dale Cathell, writing for the Court, also observed that it would be unlikely that any

oral agreement between a husband and wife that "what is hers is hers and what is mine is mine" could ever contain the degree of specificity referenced by *Falise*:

> Accordingly, in the case *sub judice*, the trial court's finding that an agreement existed "between these parties that their property was sole and separate" is clearly erroneous. **We would doubt, although we do not now specifically hold, that a "what is hers is hers and what is mine is mine" oral agreement, no matter how often repeated, could ever contain the degree of specificity required by *Falise***, i.e., "the parties must specifically provide that the subject property must be considered 'non marital' or in some other terms specifically exclude the property from the scope of the Marital Property Act." *Falise*, 63 Md.App. at 581, 493 A.2d 385. Accordingly, we shall vacate the trial court's judgment on this issue.

*Id.* 203 (emphasis added). Although *Golden* went on in *dicta* to explore what should occur on remand, its central holding regarding the lack of a valid agreement, because of insufficiency of evidence supporting the existence of such, is not apposite in the instant case, because the trial court judge did find that, "It would seem that it was the parties' mutual agreement that the property would be wife's property," although she immediately obviated that finding by requiring the *Falise* classification language.

To return to the main issue, however, there are, generally, three different types of agreements that can be entered into in order to effect property disposition between spouses upon divorce, the separation agreement, the antenuptial agreement, and the postnuptial agreement.[14]

---

[14] Beneficiary agreements which involve the rights of spouses may also be a fourth category affecting the distribution of property of spouses, but that clearly is not before us. *See Painewebber Incorporated v. East*, 363 Md. 408 (2001),

An antenuptial agreement, also referred to as a premarital or prenuptial agreement, is entered into by prospective spouses prior to marriage and "settl[es] in advance alimony or property rights of the parties upon divorce." Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law § 14-2. One commentator has noted that prospective spouses will often enter into antenuptial agreements for the protection of their assets and property rights:

> Perhaps the most frequent motivation for entering into a premarital agreement is that the upcoming marriage is a partial or joint remarriage. A spouse about to remarry may want a premarital agreement because he or she has children from a prior relationship and wants to protect his or her assets for them, free from conflicting claims by the new spouse. A spouse about to remarry may have gone through a tumultuous divorce; he or she may desire a premarital agreement to avoid the emotional and financial costs that accompany divorce litigation over property and support rights, should another divorce occur. In some cases, a premarital agreement may be motivated by a prospective spouse's hostility to the state law concept that marriage is an economic partnership and to the sharing of income and property, particularly at divorce.

Gail Frommer Brod, *Premarital Agreements and Gender Justice*, 6 Yale J. L. & Feminism 229, 238–40 (1994) (footnotes omitted).

An antenuptial agreement is interpreted according to the objective theory of contracts and subject to traditional contract defenses, such as fraud, duress, coercion, mistake, undue influence, incompetency, or unconscionability at the time the agreement was entered into. Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law §§ 14-1, 14-2[b]. Unlike other contracts, however, a "confidential relationship exists between the parties, as a matter of law" in an antenuptial agreement. *Id.* § 14-2(b). To establish the validity of an antenuptial agreement, however, its proponent must show that there was no "overreaching," requiring an exploration of "whether in the atmosphere and

25

environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement." *Id.*

The absence of overreaching may be established by showing that there was a "frank, full and truthful disclosure of [each party's] respective worth in real and personal property so that 'he or she who waives can know what it is he or she is waiving.'" *Id.* Even when no disclosure has been made, the party seeking to enforce the antenuptial agreement may prove that overreaching did not occur by showing that the challenging party had "adequate knowledge of the existence of the assets subject to the waiver and knowledge of what those assets are worth in sum so that the attacking party knows what he or she is waiving." *Id.* § 14-2(e). Alternatively, the validity of an antenuptial agreement may be proved if the challenging party was not prejudiced by the lack of disclosure or knowledge, which is proven by showing that the "benefit to the waiving party was commensurate with what he or she relinquished such that the agreement was fair and equitable and/or . . . the party attacking the agreement entered into the agreement freely and understandingly." *Id.* § 14-2(b).[15]

---

[15] In *Cannon v. Cannon*, 384 Md. 537, 550 n.6 (2005), Judge Glenn Harrell, writing for this Court, observed that the circuit court, in evaluating the antenuptial agreement at issue there, relied on an earlier version of *Fader's Maryland Family Law* for an articulation of five "considerations" in determining the validity of an antenuptial agreement:

> [1] fair and equitable in procurement and result[; 2] parties must make frank, full and truthful disclosure of all their assets[; 3] the agreement must be entered voluntarily, freely and with full knowledge of its meaning and effect[; 4] the importance of independent legal advice in evaluating whether the agreement was voluntarily and understandingly made is emphasized[; 5] there is a confidential relationship between the parties which, if a contest to validity occurs, shifts the

(continued . . . )

26

In *Herget v. Herget*, 319 Md. 466 (1990), we considered the effect of an antenuptial agreement, which was entered into prior to the effective date of the Marital Property Act, on the wife's allegation that she was entitled to a monetary award under the statute. The language of the antenuptial agreement at issue provided that the wife had

> release[d] and surrender[ed] any and all claims she may have, now, or at the time of any termination of the proposed marriage between the parties, by divorce, death or otherwise, in any estate or property of [the other], now owned or hereafter acquired by him, including all rights to support . . . and all other rights and interest of every kind therein that shall arise out of the relation of the parties as husband and wife. . . .

*Id.* at 469. We accepted the trial court's finding that the antenuptial agreement was valid and that "the plain language of the agreement evidenced the intent of both parties to exclude and protect the property of each from any and all claims of the other that might arise out of their relationship as husband and wife." *Id.* at 468.

We parted ways with *Falise*, however, in determining that the wife's release did encompass any claims to an award under the Marital Property Act, a result contrary to that which was decided in *Falise*, when we said:

> We reject the notion that the parties in the case before us were incapable of releasing a right that did not then exist. We also reject the argument that general knowledge cannot effect a full release of a specific right, even a right that is unknown at the time the agreement is drawn.
> We return then, to the first and more difficult question presented by this case—was the general language employed by the parties in this case sufficient to effect a mutual release of the then unknown right to a monetary award? We hold that it was.
>
> \*        \*        \*

( . . . continued)
> burden of proof to the one attempting to uphold the agreement to prove that it is fair and equitable.

27

We think it clear that in referring to mutual releases of all claims of rights or interests that each party might have or might thereafter acquire in and to any property of the other, these parties were using the term "property" in its broad sense. They manifested an unequivocal mutual intent to free all of their estate and property from any claims by the other that might arise by virtue of their marriage. If a monetary award is now allowed, that intent will be frustrated, because the award will have to be paid from the property, whether cash, personalty, or realty, of the party against whom the award is made.

*Id.* at 473–76. In so doing, we questioned the efficacy of *Falise* and validated the antenuptial agreement by using contract principles to interpret its language and the parties' intent.

The Court of Special Appeals in *Harbom*, 134 Md. App. at 438, also considered the validity of an antenuptial agreement in the context of a divorce in which each party had waived "any right or claim . . . in the property of [the other party, including] all future growth, interest, . . . or changes in assets, traceable to [the other party's] current ownership of the property." In considering whether the antenuptial agreement was invalid, based on the husband's failure to disclose the value of his assets to the wife prior to its execution, the court applied the traditional test, heretofore articulated, for antenuptial agreements:

First, if the parties wish to insulate the agreement from subsequent challenge on the basis of overreaching, full, frank, and truthful disclosure serves to make the validity of the agreement "impregnable." The alternative to full disclosure is proof that the disgruntled party had a "general idea" of the spouse's property and resources. When there is neither full disclosure or actual knowledge and the allowance to the party who waives is unfairly disproportionate to the worth of the property involved, the party seeking to uphold the agreement simply must shoulder the burden to prove that it was entered into voluntarily, freely, and with full knowledge of its meaning and effect.

28

*Id.* at 444. In consideration of these principles, the intermediate appellate court affirmed the trial court in its determination that the antenuptial agreement was valid, because, though the value of the assets had not been disclosed, the wife "had reasonably good understanding of what she was giving up." *Id.* at 449.

In each of the cases that we have found which involved an antenuptial agreement affecting the disposition of property in divorce, issued after the advent of the Marital Property Act, the traditional notions governing the evaluation of such agreements have been applied to govern the division of property and its value, *without* any reference to the reclassification language of *Falise*.

"[S]imilar to an antenuptial agreement" is a postnuptial agreement that is "a contract—in this instance between a married couple—that sets forth the rights, duties and responsibilities of the parties during and upon termination of the marriage through death or divorce." Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law § 14-15. As such:

> Postnuptial agreements often look a lot like prenuptial agreements. In both contexts, couples are trying to assure that their financial situation is certain and predictable. . . . Alternatively, many postnuptial agreements attempt to use financial rewards and penalties to create incentives during a marriage that constrain the behavior of both spouses.

Sean Williams, *Postnuptial Agreements*, 2007 Wis. L. Rev. 827, 835 (2007). Williston has observed that "property settlements or other postnuptial agreements, whether in contemplation of divorce or otherwise, are generally held to be binding when they are shown to be fair and regular and not unconscionable or the product of fraud, duress,

mistake or undue influence; and certainly when they have been fully executed they will be given effect." 7 Williston on Contracts § 11:7 (4th ed. 2017).

The validity of an agreement affecting property and its division upon divorce was considered in *Harbom*, 134 Md. App. at 451, in which the creation of an individual retirement account ("IRA") under the wife's name with the husband's funds during their marriage was held to constitute a valid agreement under Section 8-201(e)(3)(iii) of the Family Law Article (1984, 1999 Repl. Vol.) to exclude that property as nonmarital. The Court of Special Appeals iterated that in order to establish that the IRA was not marital property, proof of "donative intent, delivery or relinquishment of dominion, and acceptance (which is presumed in the absence of evidence to the contrary)" was required; the requisite donative intent would be the "intention to give or relinquish the contingent equitable claim that arises from the marital/nonmarital status of the property." *Id.* at 452. Applying, thus, only a gift analysis, the intermediate appellate court, without any mention of *Falise* and its reclassification requirement, excluded the lRA from marital property and "classified" the IRA as nonmarital:

> In the case *sub judice*, the court reasoned that the IRA was nonmarital because "[f]rom the testimony . . . I think it was a gift" from appellant to appellee. We interpret the court's statement as a finding that appellant made a gift of his legal and equitable interest in the IRA funds; thus, the court did not err in this determination. Appellant was meticulous in his financial record-keeping and he took care that all of his significant investment and real estate holdings—even the family cars—were titled solely in his name. The properties that were not so titled were: the Billow Row property, which was titled as tenants by the entireties, pursuant to the antenuptial agreement; the Crows Nest property, which appellant had titled as tenants by the entireties to make appellee comfortable in the marriage and to get her excited about the house; and the IRA, which appellant created primarily with his nonmarital funds, also to make appellee comfortable in the marriage.

30

Appellant testified that "the Prenuptial Agreement was a big concern for [appellee]. She constantly talked about it . . . [S]he wanted to own everything that I owned. She wanted the Prenuptial Agreement torn up." It is reasonable to believe from this testimony that appellant created the IRA to alleviate appellee's concern that she had nothing in the marriage. When contrasted with appellant's usual practice of titling everything solely in his name to ensure his equitable interest therein, his creation of the IRA in appellee's name may be interpreted as evidencing an intent to relinquish his equitable interest in those funds. The trial court did not err in classifying the IRA as nonmarital.

*Id.* at 452–53.

In *Newborn v. Newborn*, 133 Md. App. 64 (2000), the Court of Special Appeals considered the trial court's finding that a postnuptial agreement did not exist between husband and wife, where proceeds from the husband's personal injury settlement, which had included a claim for loss of consortium, were distributed 95% to the husband and 5% to the wife into separately titled accounts during their marriage. Agreeing with the trial court that no agreement existed, our intermediate appellate court explained that there was no proof of an agreement to exclude those funds as nonmarital property:

> The trial judge did not err in the manner appellant alleges. First of all, Mr. Newborn's testimony that the parties agreed as to how the accounts should be titled was rebutted by the testimony of Ms. Newborn. According to her testimony, Mr. Newborn acted alone when he decided to title the Legg Mason accounts ninety-five percent to five percent in his favor. Second, even if the parties did agree as to how the accounts were to be titled, that agreement would not be determinative as to whether the property was marital. What would be determinative under FA section 201(e) would be an agreement to exclude as marital property certain (or all) of the proceeds from the personal injury settlement. Here, there was no evidence of such an agreement.

*Id.* at 82. The court went on to consider whether the funds from the personal injury settlement constituted marital property and remanded the issue to the circuit court to permit proof by the wife of whether any part of the proceeds was marital.

31

Although the stable of postnuptial agreements in our jurisprudence in which a property disposition upon divorce is considered is relatively sparse, it is clear that none of the cases has applied the *Falise* reclassification requirement to determine the validity of the postnuptial agreement.

In the present case, the trial judge found that the 2005 agreement between Mr. and Ms. McGeehan made manifest by the transfer by deed of Embassy Park, Farside, and Mason Neck to Ms. McGeehan was made during the course of their marriage to appease her for the loss of her inherited stock portfolio:

> In 2005, wife discovered that husband had been trading her premarital stock account and she discovered that when she got a tax bill from the State of Virginia for over $592,000. This was a time of crisis for the couple and at that time it led them both to contemplate the future of their marriage. Wife made a new will leaving everything to her children and had her family's estate attorney write up a waiver of the statutory share of her husband to sign. Wife lost trust in husband, demanded that he transfer the parties' Embassy Park Drive home, Farside home in Ellicott City and the [Mason Neck] property in Virginia into her sole name. Husband alleges that this was done for estate planning purposes due to his risky employment but it's more credible that it was done to appease wife who was distraught over losing her inherited stock portfolio. The parties continued in the marriage after this.

With respect to the Mason Neck property, having already classified Log Jump as marital, the trial judge found that the parties intended that the property would be wife's. The judge then neutralized that agreement by requiring the *Falise* reclassification language.

In so doing, the trial judge obviated her central finding by requiring that the parties insert the reclassification language of nonmarital as mandated in *Falise*. In this, she erred; the *Falise* dictates are inapplicable to negate the McGeehans' postnuptial agreement to transfer Mason Neck and its value to the wife.

32

The bases for the trial judge's finding that it was the parties' "mutual agreement that the property would be wife's property" were the deeds that conveyed the property to the wife as her sole and separate property; the wife's discovery of her alienated inheritance; the simultaneous execution during the marriage of the deeds for Mason Neck, Farside, and Embassy Park; and the execution of a new will by Ms. McGeehan excluding Mr. McGeehan and Mr. McGeehan's waiver of his statutory share. The judge's finding of validity of the agreement is supported in the record and in our jurisprudence addressing validity of postnuptial agreements.[16] The same conclusion can be drawn regarding the Farside and Embassy Park deeds executed contemporaneously with Mason Neck.

As a result, there was a valid postnuptial agreement to exclude Mason Neck as the nonmarital property of Ms. McGeehan. With respect to Log Jump, the trial judge, on remand, must initially consider whether there was a valid agreement to exclude Log Jump as nonmarital under Section 8-201(e)(2) of the Family Law Article. Absent such an agreement, the judge must then consider whether the source of funds for the purchase of Log Jump, based upon the testimony elicited that the proceeds of the sale of Farside and Embassy Park, which were transferred in 2005 to the wife, was traceable thereby to her contribution under Section 8-205(b)(8)–(9) of the Family Law Article.

---

[16] Mr. McGeehan has not asserted by way of a cross petition any challenge to the judge's finding that the agreement between the parties was valid, absent the application of the *Falise* tenets.

**JUDGMENT OF ABSOLUTE DIVORCE AFFIRMED; JUDGMENT GRANTING MONETARY AWARD VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THE VIEWS EXPRESSED IN THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Howard County
Case No: 13-C-14-101752
Argued: June 2, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 93

September Term, 2016

_____

ANN MCGEEHAN

v.

MICHAEL MCGEEHAN

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Getty,
Battaglia, Lynne A. (Senior Judge,
Specially Assigned),

JJ.

_____

Concurring Opinion by Getty, J.

_____

Filed: August 10, 2017

While I agree with the result reached today by the Majority, I would reach it on somewhat different grounds. Specifically, I would explicitly overturn the Court of Special Appeals' holding in *Falise v. Falise*, 63 Md. App. 574, 581 (1985), that "[i]n order to exclude property 'by valid agreement' from the reach of a monetary award, [ ] parties must specifically provide that the subject property must be considered 'non marital' or in some other terms specifically exclude the property from the scope of the Marital Property Act." Therefore, I respectfully concur.

Maryland Code, Family Law Article (1984, 2012 Repl. Vol.) ("FL") 8-201(e) provides that property that is acquired by one or both parties during a marriage, however titled, is generally considered "marital property." However the statute also sets forth several exceptions under which property acquired during a marriage by one or both parties is not considered "marital property." One of those exceptions is for property "excluded by valid agreement." FL 8-201(e)(2)-(3). One consequence of such an agreement to exclude real property that is held by one party to a marriage from being considered "marital property" is that, in the event of a subsequent divorce between the married parties, the excluded property would not be subject to a monetary award pursuant to FL § 8-205.[1]

---

[1] When a party in a divorce proceeding petitions the trial court for a monetary award, the trial court follows a three step procedure,

> First, for each disputed item of property, the court must determine whether it is marital or non[-]marital. Second, the court must determine the value of all marital property. Third, the court must decide if the division of marital property according to title will be unfair; if so, the court may make a monetary award to rectify any inequity. . . .

In this divorce action, the trial judge found that there was a "mutual agreement" between the parties, entered into during the course of their marriage, that Mr. McGeehan would "convey all his rights, title and interests" in the Mason Neck, Farside, and Embassy Park properties to Ms. McGeehan, so that those properties "would be wife's property." Maj. Slip Op. at 4-6. However, the trial judge ruled that the agreement was insufficiently specific to exclude the Mason Neck property from being "marital property," because the parties did not expressly state that the properties would be excluded from being considered as marital property in the future.[2]

The practical effect of the trial judge's ruling that there was no valid agreement to exclude any of the properties from being "marital property" was that the properties at issue could be the subject of a "monetary award [ ] as an adjustment of the equities and rights of the parties concerning marital property." FL § 8-205. And, although not mentioned by the

_Reichert v. Hornbeck_, 210 Md. App. 282, 361 (2013) (quoting _Innerbichler v. Innerbichler_, 132 Md. App. 207, 228 (2000)) (additional internal citations omitted). In making a determination as to whether it would be equitable to grant a marital award, and if so for what amount, a trial court must consider parties' marital and non-marital property. _See_ FL § 8-205(b) (listing factors a trial court must consider in making a determination as to a marital award, including "the value of all property interests of each party"). However, a monetary award may only be awarded "as an adjustment of the equities and rights of the parties **concerning marital property**." FL 8-205(a) (emphasis added). Thus, while a trial court must consider both marital and non-marital property, the focus of the marital award is to reach an equitable division of marital property.

[2] By the time of the divorce proceedings, the Farside and Embassy Park properties had been sold. But, the record indicates that the proceeds of that sale may have been rolled into the purchase of a fourth property, the Log Jump property. Maj. Slip Op. at 2. The trial judge did not make findings as to that issue and "also determined that the Log Jump property . . . was marital property, without any discussion of whether any portion of it was excluded by valid agreement or any consideration of its financial underpinnings or source of funds." _Id._ at 4.

2

Majority, the trial judge did in fact grant a $230,000 monetary award to Mr. McGeehan. *McGeehan v. McGeehan*, No. 2445 Sept. Term 2015, 2016 WL 6299681, at *2 (Md. Ct. Spec. App. Oct. 26, 2016).

In reaching her ruling that there was no agreement to exclude the properties at issue from being marital property, the trial judge explicitly relied upon the Court of Special Appeals' opinions in *Falise v. Falise*, 63 Md. App. 574 (1985) and *Golden v. Golden*, 116 Md. App. 190 (1997), explaining,

> It would seem that it was the parties' mutual agreement that the [Mason Neck] property would be wife's property. Under the law of Maryland, even though property is titled in the name of one party or another party, it remains marital property and can be excluded by agreement of the parties. But the law is clear that to do that, and I just learned this, the agreement has to be specific not just that it's my sole and separate property but it is my sole and separate property and will be excluded from marital property in the future. It has to be explicitly stated. It was not explicitly stated. I've seen no evidence that it was. So, under the cases of <u>Golden versus Golden</u> and <u>Falise versus Falise</u>, the property is now marital. However, it's titled in wife's name.

Maj. Slip Op. at 4.

*Falise*

In *Falise*, the Court of Special Appeals addressed the significance of a separation agreement entered into by a married couple, the Falises. 63 Md. App. at 577. Several years into their marriage, the Falises separated and entered into a separation agreement which provided, in pertinent part, that the Falises would each "mutually release, waive, surrender and assign unto the other, his or her heirs, personal representatives and assigns, all rights, title, interest and claims which said parties might now have or may hereafter have as the husband, wife, widower, widow, next of kin, successor or otherwise, in and to any

3

property, real or personal, that either of said parties may own or hereafter acquire[.]" *Id.* at 578 n.1. During the parties' separation, Mr. Falise acquired property titled in his name in Howard County. *Id.* at 577. The parties subsequently entered into a short-lived reconciliation, during which a house was built on that property titled in both parties' names as tenants by the entirety. *Id.* at 577-78. Ultimately, after the reconciliation broke down, Mr. Falise filed for divorce, which was granted by the trial court. *Id.* at 578. The trial judge found that the home held by the parties "was marital in part and nonmarital in part," but that "both monetary and non-monetary contributions of [Mrs. Falise were] nominal," and consequently granted a minimal monetary award of $2500 to Mrs. Falise. *Id.* at 579.

The Court of Special Appeals held that the separation agreement entered into by the Falises did not exclude the property subsequently acquired by Mr. Falise from being marital property. The intermediate appellate court offered two reasons for its holding. First, it suggested that "marital property" was not covered by the agreement because it was not an interest in real or personal property, explaining,

> We doubt that the subject agreement could affect the status of something which is neither an interest in real or personal property, *i.e.*, marital property. Marital property is merely a term created by the legislature to describe the status of property acquired during the marriage, however titled (as defined in [FL § 8-201(e)]), title to which may have given rise to a potential inequity, upon dissolution of the marriage. That inequity, conceptually, may be corrected via a different legislative creature called the "monetary award." Thus, the only function of "marital property" is to form a base for a "monetary award." The legislature never intended that either spouse could have a legal interest in the "marital property" of the other since it merely intended to cure the title[-]created inequity through the issuance of a "monetary award."

*Id.* at 580.

4

The Court of Special Appeals in *Falise* also reasoned that because the Marital Property Act did not exist at the time of the parties' agreement, Ms. Falise could not be deemed to have released a right that she did not have and could not have fairly anticipated. *Id.* at 580-81. The intermediate appellate court cited in support to the case of *Smith v. Smith*, in which the Supreme Court of New Jersey considered whether a similar mutual release in a separation agreement would prevent a trial court from making an equitable distribution during a divorce. 371 A.2d 1 (1977). That court noted that generally, under New Jersey law, "claims arising after the date of delivery of the instrument are not covered by it unless explicitly mentioned, since they would not appear to have been within the contemplation of the parties." *Id.* at 6. Because, at the time the couple entered into the separation agreement, New Jersey courts "had no power to make an equitable distribution of marital assets" the court held that the agreement "cannot be regarded as having released a right which [a party] did not have and could not fairly have anticipated." *Id.*

Consequently, the intermediate appellate court held that "[i]n order to exclude property 'by valid agreement' from the reach of a monetary award, we believe that the parties must specifically provide that the subject property must be considered 'non marital' or in some other terms specifically exclude the property from the scope of the Marital Property Act." *Id.* at 581.

### *Herget*

Five years later, this Court in *Herget v. Herget*, 319 Md. 466 (1990) strongly disapproved of the Court of Special Appeals' reasoning behind the specificity requirement stated in *Falise*. In *Herget*, a couple had entered into an antenuptial agreement two days

5

prior to their marriage, which stated that each party "waives and surrenders any and all claims she may have, now, or at the time of any termination of the proposed marriage between the parties," in the property of the other "now owned or hereafter acquired." 319 Md. at 469. A separate provision in the agreement stated that "each of the parties hereby waives and releases unto the other party, her or his heirs, next of kin, personal representatives and assigns, all of her and his respective rights, interests and claims in and to said property of the other[.]" *Id.* The parties subsequently divorced, and the wife contended that the agreement was invalid and, if valid, did not have the effect of barring her from receiving a monetary award. *Id.* at 467-68. The trial court found the agreement to be valid, but the Court of Special Appeals agreed with the wife that "the wife's claim for a monetary award was not barred by the terms of the agreement." *Id.* at 468. On appeal to this Court, "[t]he sole issue with which we [were] concerned [was] whether the agreement bars the wife's claim for a monetary award." *Id.* at 470.

We noted that the Court of Special Appeals had followed *Falise*, and held that "'the right to a monetary award . . . is not an interest in the estate or property of one's spouse,' and therefore is not covered by the language of the agreement." *Id.* at 471 (quoting *Herget v. Herget*, 77 Md. App. 268, 279 (1988)). We summarized the holding of *Falise* that "the separation agreement in that case, by which each party agreed to relinquish all right, title, and interest in and to the property of the other then owned or thereafter acquired, did not effect a release of the right to a monetary award." *Id.* We also noted the two reasons the Court of Special Appeals had offered to support the *Falise* holding: that the intermediate appellate court doubted such an agreement "'could affect the status of something which is

6

neither an interest in real or personal property, i.e., marital property[,]'" and that "the wife could not be regarded as having released a right that she did not have and could not have fairly anticipated at the time the agreement was signed." *Id.* at 471-72 (quoting *Falise*, 63 Md. App. at 580).

Beginning our analysis with the second reason stated in *Falise*, we observed that the Court of Special Appeals had relied on New Jersey law stated in *Smith v. Smith*, 371 A.2d 1, 6 (1977), but held that law was "contrary to established Maryland law." *Herget*, 319 Md. at 473. We noted that in *Bernstein v. Kapneck*, 290 Md. 452 (1981), "this Court held that a broad general release of claims for injuries 'known and unknown, and which have resulted or may in the future develop' sufficiently reflected the intent of the parties to release the defendant from any responsibility for a serious brain injury about which the parties neither knew or could reasonably have known at the time the release was executed." *Herget*, 319 Md. at 473 (quoting *Bernstein*, 290 Md. at 456). We therefore stated that we "reject the notion that the parties in the case before us were incapable of releasing a right that did not then exist." *Id.* We also stated a broader rule of law, namely, that "[w]e also reject the argument that general language cannot effect a full release of a specific right, even a right that is unknown at the time the agreement is drawn." *Id.*

We then considered the Court of Special Appeals' first reason in *Falise*, that a monetary award is not a "legal interest" in real property. We agreed that "the right to a monetary award does not carry with it a 'legal interest' in the other party's property . . . in the sense of title." *Id.* at 475. However we regarded the conception of property rights and interest taken by the Court of Special Appeals as "overly narrow." *Id.* We stated that,

7

under the Maryland Marital Property Act, "this Court has approved a broad definition of the term 'property,'" explaining,

> The term property, "when considered in a broad sense, is a term of wide and rather comprehensive signification. . . . It has been stated that the term embraces everything which has exchangeable value or goes to make up a man's wealth—every interest or estate which the law regards of sufficient value for judicial recognition."

*Id.* (quoting *Deering v. Deering*, 292 Md. 115, 125 (1981)). We therefore determined that, as to the language of the agreement at issue, "in referring to mutual releases of all claims of rights or interests that each party might have or might thereafter acquire in and to any property of the other, these parties were using the term 'property' in its broad sense." *Id.* at 475-76. And, we noted that as a general matter, a claim for a monetary award is simply "a claim against the property of the person from whom the award is sought." *Id.* at 476. For those reasons, we concluded "that the intent of the parties manifested by their antenuptial agreement was to prevent the very type of claim [for a monetary award] that is now being made." *Id.* at 477.

While some older opinions may become stale or surpassed by the gradual development of the law, others, grounded on firmer reasoning, remain compelling statements of the law even many years later. I believe that *Herget* is an example of a case whose reasoning remains sound, and should be applied to the instant appeal. The statutory language at issue in *Herget*, now contained in FL § 8-201(e), has not been substantially changed, and was in existence prior to the agreement entered into between the McGeehans. This Court still generally gives full effect to the language of a general release. *See Brethren*

8

*Mut. Ins. Co. v. Buckley*, 437 Md. 332, 343 (2014).[3] Courts also continue to recognize that "rights" or "interests" as to real property are wide and comprehensive concepts, including not only title but a much broader "bundle of sticks." *See USA Cartage Leasing, LLC v. Baer*, 202 Md. App. 138, 172 (2011), *aff'd*, 429 Md. 199 (2012); *United States v. Craft*, 535 U.S. 274, 278 (2002).[4]

Therefore, pursuant to *Herget* and the broader concept of property rights and interests described in that case, I would hold that the general release entered into by the McGeehans, under which Mr. McGeehan agreed to convey "all his rights, title, and interests" in the properties at issue to Ms. McGeehan, should be given full effect. And, I would hold that the release shows a clear intent to convey the property to Ms. McGeehan free of all claims from Mr. McGeehan, including any future claims by Mr. McGeehan that the property is marital property and subject to a monetary award.

---

[3] In *Brethren* we discussed *Bernstein v. Kapneck*, 290 Md. 452 (1981), and agreed with its holding that general releases are generally given the full effect that the language of the release would allow, unless there were constitutional, statutory or policy barriers to effectuating that language. 437 Md. at 343. Although in *Brethren* we found that a there was a statutory barrier to effectuating the full language of the general release at issue before us in that appeal, *see id.* at 344-45, that is not true here. As to agreements between married parties to exclude property from being considered marital property, not only is there not a statutory barrier, but the relevant statute expressly *permits* a party to exclude property by valid agreement. FL § 8-201(e).

[4] Moreover, a spouse's potential future interest in receiving a marital award for marital property, which is contingent upon a divorce and the decisions of a trial court, is akin to the expectancy interest of a potential beneficiary in a will, which is contingent upon whether the testator decides to include that individual in his will and under what terms. Maryland law has long recognized that the contractual conveyance of such future expectancy interests may be valid and enforceable. *See Keys v. Keys*, 148 Md. 397 (1925). *See also Douglas v. Lyles*, 841 A.2d 1, 5 (D.C. 2004).

9

*Golden*

*Golden v. Golden*, 116 Md. App. 190 (1997) is the second case on which the trial

judge in the instant case relied. However, *Golden* is inapposite to the facts of this case.

The Majority describes the holding in *Golden*,

> In *Golden*, the Court of Special Appeals only decided whether the trial court
> had erred in finding the existence of an oral agreement entered into
> premaritally that essentially iterated "what was hers was hers and what was
> mine was mine[.]" . . . Our intermediate appellate court in *Golden* disagreed
> and posited, "We perceive that the finding of an oral property settlement
> agreement was erroneous. We perceive of nothing in the testimony or
> evidence in this case that would constitute an agreement sufficient to bind
> the parties to it or to support the trial judge's finding."

Maj. Slip Op. at 23 (quoting *Golden*, 116 Md. at 201-202).[5] In contrast, the trial court in

this case ruled that a valid agreement existed whereby Mr. McGeehan would "convey all

his rights, title and interests" in the Mason Neck, Farside, and Embassy Park properties to

Ms. McGeehan. Therefore, *Golden* does not control the outcome here.

*Conclusion*

As the trial court's ruling is not supported by *Golden*, the resolution of this appeal

turns on whether the trial judge was correct to rely on *Falise* to find that the parties'

agreement did not apply to exclude Mason Neck, Farside, and Embassy Park from being

considered "marital property" and the subject of a monetary award because the agreement

---

[5] The Court of Special Appeals also stated in *Golden*, in *dicta*, that "[w]e would
doubt, although we do not now specifically hold, that a 'what is hers is hers and what is
mine is mine' oral agreement, no matter how often repeated, could ever contain the degree
of specificity required by *Falise*, *i.e.*, 'the parties must specifically provide that the subject
property must be considered 'non marital' or in some other terms specifically exclude the
property from the scope of the Marital Property Act.'" *Golden*, 116 Md. App. at 203
(quoting *Falise*, 63 Md. App. at 581).

did not specify that those properties would be considered non-marital or outside the scope of the Marital Property Act. The Majority holds that the trial court erred in so ruling because Maryland courts have not applied the holding in *Falise*, which involved a marital separation agreement, to the type of postnuptial agreement entered into by Mr. and Ms. McGeehan (or to antenuptial agreements). Maj. Slip Op. at 32.

Although I have no dispute with the Majority's conclusion that *Falise* has been narrowly applied, I believe that in light of our prior decision in *Herget*, a more straightforward way to resolve this appeal would be to simply overturn the holding in *Falise* that "in order to exclude property 'by valid agreement' from the reach of a monetary award . . . parties must specifically provide that the subject property must be considered 'non marital' or in some other terms specifically exclude the property from the scope of the Marital Property Act." 63 Md. App. at 581. And, having first overturned *Falise*, I would thereafter hold that, pursuant to *Herget*, the agreement entered into by the parties— that Mr. McGeehan would "convey all his rights, title and interests" to Ms. McGeehan— is a valid agreement to exclude that property as marital property under FL § 8-201(e).[6] For that reason, I respectfully concur.

---

[6] As a more general statement of the law, I would also hold that any valid contractual agreement by a party to a marriage to waive, transfer, convey, or otherwise grant all or any rights, title, and interest in certain real property to his or her spouse, or a similar mutual agreement entered into by both spouses, is a valid agreement to exclude that property as marital property under FL § 8-201(e).

11